Gordon JOHNSEN, Lewis Phan, Petro Investments, Inc., a Nevada corporation, Magoil Investments, Inc., a Nevada corporation, Oil Resources Enterprise, a California Partnership, School Land Oil Company, a California Partnership, Calabasas Oil Company, a California Partnership, Carolwood Oil Company, a California Partnership, Hidden Hills Oil Company, a California Partnership, Thousand Oaks Oil Company, a California Partnership, Tioga Oil Company, a California Partnership, Pilgramage Oil Company, a California Partnership, Broadway Oil Enterprise, a Colorado Limited Partnership, Dumetz Oil Enterprise, a Colorado Limited Partnership, Plaintiffs,

v.

Jerry L. ROGERS; Oil-Gas Equipment Co., Inc., an Oklahoma corporation; James Cooper, aka James Douglas; Western Oil Resources, Ltd., a Nevada corporation, Norman W. Glade, Defendants.

No. CV 81–2464 CHH.

United States District Court, C.D. California.

Nov. 1, 1982.

David M. Garland, R.F. Wade, Newport Beach, Cal., for plaintiffs.

Barash & Hill by Gary L. Bostwick, Christina L. Machon, Los Angeles, Cal., for defendants Jerry L. Rogers and Oil-Gas Equipment Co., Inc.

Whitman & Ransom, Lee D. Unterman, Charles C. Lee, Robert P. Andreani, Los Angeles, Cal., for defendants James Cooper, aka James Douglas, and Western Oil Resources, Ltd.

*Memorandum Opinion*

CYNTHIA HOLCOMB HALL, District Judge.

This action is to recover monies paid for fractional interests in oil and gas leaseholds and "turnkey" drilling and operating contracts pursuant to the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77a *et seq.,* the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.,* and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5; and treble damages, attorney's fees and costs pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*[1]

---

1. RICO was added to Title 18 by Title IX of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 941.

## BACKGROUND

On January 22, 1982, Judge Kelleher entered an "Order re Motion of Defendants to Dismiss and Strike."[2] Judge Kelleher dismissed several claims in the First Amended Complaint and gave plaintiffs 20 days to amend certain claims. Plaintiffs filed their motion for leave to file a second amended complaint and submitted a Proposed Second Amended Complaint on January 28, 1982. In addition to making the amendments authorized by Judge Kelleher, plaintiffs sought to include claims for treble damages, attorney's fees and costs under RICO. The motion came before me on March 8, 1982. Having reviewed the Proposed Second Amended Complaint and having considered the points and authorities submitted in support of and in opposition to the motion and oral argument, I issued an Order on March 22, 1982, granting in part and denying in part plaintiffs' motion to amend. The basis of that Order is set forth below.

## STATEMENT OF THE FACTS

Plaintiffs Gordon Johnsen, Lewis Phan and School Land Oil Company ("School Land") are purchasers of fractional interests in oil and gas leaseholds and parties to turnkey drilling and operating contracts relating to those leaseholds. Defendants Oil-Gas Equipment Company, Inc. ("Oil-Gas Equipment") and Jerry L. Rogers, its president, sold the oil and gas leaseholds to plaintiffs. Defendants Western Oil Resources, Ltd. ("Western Oil") and its president James Cooper a/k/a James Douglas ("Douglas") entered into turnkey drilling and operating contracts with plaintiffs to drill and operate oil and gas wells on the purchased leaseholds.

2. This case was originally assigned to Judge Kelleher and later reassigned to me on March 19, 1982.

3. Plaintiffs also allege that they have lost expected profits as a result of defendants' fraudulent dealings. These allegations are hereby stricken. Although the Supreme Court in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972), recognized that a *seller* may recover "the difference between the fair value of all that … [he] received and the fair value of what he would have received had there been no

Plaintiffs allege that defendants, individually and as co-conspirators, made material misrepresentations and concealed material facts from plaintiffs regarding the geology and potential productivity of the leaseholds to induce plaintiffs to purchase the leaseholds and to enter into drilling and operating contracts with defendants. These acts allegedly were done in violation of RICO and the federal securities laws and resulted in plaintiffs' loss of a substantial portion of their investment.[3]

## RICO CLAIMS

Plaintiffs, in the Proposed Second Amended Complaint, allege RICO claims for the first time. Plaintiffs assert that defendants' conduct violated 18 U.S.C. § 1962(c) which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs *through a pattern of racketeering activity* or collection of unlawful debt. [Emphasis added].

Plaintiffs contend that defendants' conduct constitutes "racketeering activity" as defined in 18 U.S.C. § 1961(1)(D): "(1) 'Racketeering activity' means … (D) any offense involving … fraud in the sale of securities …." Section 1961(5) of Title 18 provides that a "pattern of racketeering activity" requires at least two acts of racketeering activity within ten years of each other. If plaintiffs could successfully demonstrate that they were injured "in [their]

fraudulent conduct," *i.e.,* the benefit of the bargain, this remedy is unavailable to a *buyer* such as plaintiffs where the lost benefits are highly speculative. *Compare Sigafus v. Porter,* 179 U.S. 116, 21 S.Ct. 34, 45 L.Ed. 113 (1900); *Smith v. Bolles,* 132 U.S. 125, 10 S.Ct. 39, 33 L.Ed. 279 (1889); *See also Osofsky v. Zipf,* 645 F.2d 107, 112 (2d Cir.1981); *Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); H. Bloomenthal, *Securities and Federal Corporate Law,* §§ 8.26[1] and 9.22[2] (1981).

business or property by reason of a violation of section 1962," they would be entitled to recover treble damages, attorney's fees and costs of the suit. 18 U.S.C. § 1964(c).

■ "Leave to amend should be freely given when justice so requires." Fed.R. Civ.P. 15(a). However, as the Supreme Court stated in *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), leave may be denied when there is an apparent reason to do so, "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.. . . ."

■ The facts supporting the RICO claims are the same as those supporting the securities fraud claims, *i.e.*, defendants' fraud in the sale of securities. Plaintiffs were necessarily aware of all the facts asserted in support of the RICO claims prior to filing the Complaint on May 20, 1981, the First Amended Complaint on June 23, 1981, and their opposition to defendants' motions to strike and to dismiss the First Amended Complaint on November 2, 1981. At no time prior to filing the Proposed Second Amended Complaint on January 28, 1982 did plaintiffs assert a RICO claim.

Plaintiffs' sole justification for their eight-month delay in bringing the RICO claims is that they had not previously thought of them. Based on the severity of the remedies available under RICO, the eight-month delay and the absence of any justifiable excuse for the delay, the Court exercises its discretion under Rule 15(a) of the Federal Rules of Civil Procedure and denies plaintiffs' motions to add the RICO claims. *Compare Komie v. Buehler Corp.*, 449 F.2d 644 (9th Cir.1971); *see also* 6 C. Wright & A. Miller, *Federal Practice and Procedure* §§ 1487–1488 & n. 93, at 435, 443 (1971).

Even were the RICO claims timely raised, the Court finds those claims legally insufficient on their face.[4] Congress expressly provided that "the provisions of [RICO] shall be liberally construed to effectuate its remedial purposes," Organized Crime Control Act of 1970, Pub.L.No. 91–452, Title IX, § 904, 84 Stat. 947 (1970), *codified at* 18 U.S.C.A. § 1961 note (Supp.1982), however, because RICO is primarily a criminal statute, federal courts increasingly are refusing to find a RICO claim in civil cases even though such a claim could fall within a literal reading of the statute.

These courts have taken two tacks in limiting RICO's civil application. The more direct approach has been to impose RICO's civil penalties only on "entities involved with organized crime or activities within the penumbra of that phrase."[5] The other approach has been to define narrowly the type of injury protected by the Act.[6] In so doing, these courts have limited standing under 18 U.S.C. § 1964(c) to plaintiffs

4. *See generally* 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1487 & n. 58, at 432–33 (1971) (court may deny leave to amend complaint where claim asserted is insufficient on its face).

5. *See, e.g., Adair v. Hunt International Resources Corp.*, 526 F.Supp. 736, 746–748 (N.D. Ill.1981); *Waterman Steamship Corp. v. Avondale Shipyards, Inc.*, 527 F.Supp. 256 (E.D.La. 1981); *Barr v. WUI/TAS, Inc.*, 66 F.R.D. 109, 112–13 (S.D.N.Y.1975); *see also Kleiner v. First National Bank*, 526 F.Supp. 1019 (N.D.Ga. 1981).

In the criminal context, however, it is clear that the prosecution need not prove a defendant's involvement in "organized crime." *See United States v. Campanale*, 518 F.2d 352, 363–365 (9th Cir.1975), *cert. denied sub nom. Matthews v. United States*, 423 U.S. 1050, 96 S.Ct.

777, 46 L.Ed.2d 638 (1976); *United States v. Bledsoe*, 674 F.2d 647, 663 (8th Cir.1982); *United States v. Aleman*, 609 F.2d 298, 303–304 (7th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Mandel*, 415 F.Supp. 997, 1018–1019 (D.Md.1976).

6. *See, e.g., Harper v. New Japan Securities International, Inc.*, 545 F.Supp. 1002 (C.D.Cal. 1982) (Tashima, J.); *Van Schaick v. Church of Scientology, Inc.*, 535 F.Supp. 1125 (D.Mass. 1982); *Landmark Savings & Loan v. Rhoades*, 527 F.Supp. 206 (E.D.Mich.1981); *North Barrington Development, Inc. v. Fanslow*, 547 F.Supp. 207 (N.D.Ill.1980); *see also Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 457 (7th Cir.1982).

alleging something more, or different, than direct injury resulting from the predicate acts that constitute the racketeering activity.[7] Instead, a plaintiff must allege a commercial or "racketeering enterprise" injury. *See Harper, supra,* 545 F.Supp. at 1007; *Van Schaick, supra,* 535 F.Supp. at 1137 n. 11; *Landmark Savings, supra,* 527 F.Supp. at 208; *cf. North Barrington Development, supra,* (requiring an allegation of a competitive injury).

As the courts in *Van Schaick* and *Landmark Savings* noted, 18 U.S.C. § 1964(c) is similar to the treble damage provision contained in section 4 of the Clayton Act, 15 U.S.C. § 15.[8] To recover treble damages under section 4, a "[p]laintiff must prove 'antitrust injury,' which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

▪ I find that a plaintiff similarly must allege a "racketeering enterprise injury" to recover treble damages under RICO; that is, a commercial injury caused by the conducting of an "enterprise's affairs through a pattern of racketeering activity."[9] Congress' primary purpose in enacting RICO was to "cope with the infiltration of legitimate business" by organized crime. *United States v. Turkette,* 452 U.S. 576, 592, 101 S.Ct. 2524, 2533, 69 L.Ed.2d 246 (1981). "The Act's drafters perceived a distinct threat to the free market in organized criminal groups gaining control of enterprises operating in that market. These congressmen thought that organized criminal elements exert a monopoly-like power in the legitimate economic sphere." *United States v. Bledsoe,* 674 F.2d 647, 662 (8th Cir.1982).[10]

Section 1964(c) of Title 18 provides a cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 ...." While plaintiffs summarily conclude that they "have been injured in their business or property" by defendants' acts (Proposed Second Amended Complaint, ¶¶ 158 and 165), it is clear that the injury to which plaintiffs refer is merely the direct injury caused by the predicate acts of securities fraud. Plaintiffs allege that defendants made fraudulent representations inducing plaintiffs to purchase oil and gas leaseholds and to enter into drilling and operating agreements. As a result, plaintiffs claim that they lost a substantial portion of their investments. The federal securities laws will provide plaintiffs with a remedy for their injuries if they prove the facts alleged.

▪ I conclude that Congress in drafting § 1964(c) did not intend to provide an additional remedy for an already compensable injury. As the court in *United States v. Bledsoe, supra,* 674 F.2d at 659, stated in the criminal context: "We are satisfied

---

**7.** In this case, for example, the predicate acts are the alleged fraudulent representations made in the sale of securities (the leaseholds and turnkey contracts); the injuries resulting therefrom are the loss of monies invested in those securities.

**8.** 15 U.S.C. § 15 provides:
Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and recover the cost of suit, including a reasonable attorney's fee.

**9.** 18 U.S.C. § 1962(c). A racketeering enterprise injury may also be caused by a violation of §§ 1962(a) and (b).

**10.** *See also* the Congressional Statement of Findings and Purpose that prefaces the Organized Crime Control Act of 1970:
The Congress finds that ... (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens....
Pub.L. 91–452, Title IX, § 1, 84 Stat. at 922–23, *codified at* 18 U.S.C. § 1961 note (1976).

that RICO was not designed to serve as a recidivist statute, imposing heavier sentences for crimes which are already punishable under other statutes." *See also Adair v. Hunt International Resources Corp.*, *supra*, 526 F.Supp. at 747 ("There simply is no hint in the congressional proceedings that the Act was viewed as an alternative, and cumulative, remedy for private plaintiffs alleging securities fraud . . . .").

■ Because plaintiffs have failed to allege a racketeering enterprise injury, I find that they lack standing to sue under § 1964(c). Accordingly, for this additional reason, plaintiffs' motion to include the RICO claims is denied.[11]

### SECURITIES CLAIMS

■ Defendants assert that the Fifth and Sixteenth Claims, previously dismissed by Judge Kelleher with leave to amend, again fail to state a claim under § 17(a) of the Securities Act, 15 U.S.C. § 77q(a); § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); or Rule 10b–5 promulgated thereunder. I disagree and find that plaintiffs have stated a claim under all three provisions.

The Fifth Claim relates to alleged misrepresentations made by defendants to induce plaintiffs to enter into a turnkey drilling contract. On September 24, 1979, defendant Oil-Gas Equipment entered into an "Agreement to Drill With Option" with plaintiff Gordon Johnsen. Pursuant to this agreement, Oil-Gas Equipment agreed to transfer to Johnsen a 70% working interest in a parcel of land it leased and to drill one oil well on that land (to be known as School Land No. 2), for which Johnsen agreed to pay $200,000. In addition, Johnsen was given an option to hire Oil-Gas Equipment to drill additional wells on that parcel and to acquire a similar interest in those additional wells.

On October 1, 1979, Oil-Gas Equipment assigned approximately 74% of the working interest in its oil and gas lease to plaintiffs Johnsen and Lewis Phan, who then assigned their interest to plaintiff School Land. Johnsen and Phan were the managing partners of School Land at that time.

On November 13, 1979, School Land entered into a turnkey drilling contract with defendant Douglas and his company, Western Oil, to drill a well (to be known as School Land No. 3), for which School Land agreed to pay Western Oil $140,000.[12] School Land alleges that it entered into the turnkey drilling contract pursuant to the option clause of the September 24, 1979 "Agreement to Drill With Option." School Land then entered into an "Operating Agreement" with Douglas and Western Oil on December 1, 1979, to manage, develop and operate the leasehold.

Prior to entering into the drilling contract with Douglas, plaintiffs allege that Rogers made several misrepresentations concerning the potential oil production of the proposed well (School Land No. 3) and the competency of Douglas. In addition, plaintiffs assert that both Douglas and Rogers provided plaintiff with a brochure characterizing Western Oil as a successful oil development company and described wells that neighbored the School Land property (wells owned jointly by Douglas and Rogers) as large producers. Rogers allegedly represented that School Land No. 3 would be an "in-fill" well to the neighboring wells owned by him and Douglas. Plaintiffs fur-

---

11. Because I find that plaintiffs lack standing to sue under RICO, I need not decide whether RICO's civil remedies should be imposed on defendants not connected with organized crime.

For other discussions of RICO's scope, *see* Tarlow, *Using the RICO Statute In Civil Litigation*, Nat'l L.J., May 24, 1982, at 17; *Reading the Enterprise Back into RICO: Sections 1962 and 1964(c)*, 76 Nw.U.L.Rev. 100, 125–132 (1981).

12. Plaintiffs allege that defendant Jerry Rogers, in the presence of defendant James Douglas, stated that Rogers' company (Oil-Gas Equipment) was too busy to do the management and paper work involved in a new drilling contract. Rogers recommended that plaintiffs hire Douglas (his "partner" in numerous oil ventures), whom Rogers described as a knowledgeable and competent oil well operator. Rogers, however, represented that he still would do the drilling.

ther allege that both Douglas and Rogers knowingly concealed information concerning the productivity of the leased land.

Defendants assert that the Fifth Claim fails to allege a federal securities law violation for two reasons. First, defendants contend that because the parties did not enter into the turnkey contract prior to or contemporaneously with the sale of the oil and gas leasehold, the "in connection with" requirement of § 10(b) of the Exchange Act [13] and the "in the offer or sale" requirement of § 17(a) of the Securities Act [14] are not satisfied.[15] Second, defendants argue that the turnkey contract is not an "investment contract," but merely a simple contract and is therefore not a security.

The initial assignment of the fractional interest in the oil and gas lease and the contemporaneous agreement to drill are clearly covered by the anti-fraud provisions of the securities laws. *See, e.g., Parvin v. Davis Oil Co.,* 524 F.2d 112, 115–16 & n. 2 (9th Cir.1975); *Nor-Tex Agencies, Inc. v. Jones,* 482 F.2d 1093, 1098 (5th Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873 (1974); *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). As in *Parvin v. Davis Oil Co.,* the sale of the leasehold coupled with the exploration operation can be considered as both a "fractional undivided interest in oil, gas, or other mineral rights" and as an "investment contract."

I find that defendants' acts surrounding the turnkey contract (the making of material misrepresentations and the concealing of material facts) were employed "in the offer or sale of" and "in connection with the purchase or sale of" the fractional interest in the oil and gas leasehold. This finding is fully consistent with the broad construction to be given remedial legislation such as the Securities Act and the Exchange Act. *See SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 480 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). In selling plaintiffs the leasehold interest, defendants gave plaintiffs the option to hire defendants to drill additional wells. According to plaintiffs, the turnkey drilling contract was not a separate dealing but part of the initial transaction intended to further defraud plaintiffs by inducing them to increase their investment in the leasehold.

**13.** 15 U.S.C. at § 78j(b). Section 10 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
\* \* \* \* \* \*
(b) To use or employ, *in connection with the purchase or sale of any security* registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors (emphasis supplied).

**14.** 15 U.S.C. § 77q(a). Section 17(a) provides:
(a) It shall be unlawful for any person *in the offer or sale of any securities* by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. (Emphasis supplied.)

**15.** *See, e.g., Halperin v. Edwards & Hanly,* 430 F.Supp. 121, 125 (E.D.N.Y.1977).
I need not decide in this case whether the scope of § 17(a) and § 10(b) differ. Some courts, however, have construed the "in connection with" language of § 10(b) to cover a broader range of acts than the "in the offer or sale" language of § 17(a). *See, e.g., Maryville Academy v. Loeb Rhoades & Co.,* 530 F.Supp. 1061, 1065–66 (N.D.Ill.1981); *SEC v. Penn Central Co.,* 450 F.Supp. 908, 916 (E.D.Pa.1978). The Supreme Court, however, in *United States v. Naftalin,* 441 U.S. 768, 773 n. 4, 99 S.Ct. 2077, 2081 n. 4, 60 L.Ed.2d 624 (1979), stated that the Court was "not necessarily persuaded that 'in' is narrower than 'in connection with'." *See generally* A. Bromberg and L. Lowenfels, *Securities Fraud & Commodities Fraud,* §§ 2.2(420) and 2.3(300) (1981).

■ In addition, I find that the turnkey drilling contract, in the context alleged, is also an "investment contract" and therefore a security as defined in § 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and § 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).[16] *Compare Southwestern Drilling, Inc.* ['71–'72 Transfer Binder], Fed. Sec.Rep. (CCH) ¶ 78,382 (SEC no-action letter in which the SEC refused to conclude that a drilling contract in a similar context was not a security). In *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946), the Court set out a test to determine if an investment contract is involved:

The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.

Defendants Douglas and Western Oil contend that the turnkey contract does not satisfy this test because plaintiff School Land retained ultimate control over the leasehold and could determine whether to drill and who the driller would be. Defendants are apparently suggesting that any profits would not come solely from the efforts of others.

The Ninth Circuit, however, in light of the remedial nature of the federal securities laws, has refused to read the word "solely" as a strict or literal limitation on the definition of an investment contract. Instead, the court in *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d at 482, adopted the following, "more realistic," test:

whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.

School Land entered into the turnkey drilling contract with Western Oil and Douglas on November 13, 1979. On December 1, 1979, the same parties entered into an "Operating Agreement" that gave Western Oil and Douglas "the exclusive management, development, and operation" of the leasehold. School Land merely chose Western Oil and Douglas (on defendant Rogers' recommendation) and paid the contract price. It is clear that the efforts of Western Oil and Douglas were the "undeniably significant ones." The fact that School Land had the option to contract with someone else or to manage the leasehold itself does nothing to negate this finding. *Compare, SEC v. W.J. Howey Co., supra* (plaintiffs had similar option).[17]

The Sixteenth Claim, like the Fifth, involves a turnkey drilling contract. Plaintiffs' allegations in this claim mirror those set forth in the Fifth Claim; defendants raise the same challenges. Applying the analysis above, the Court concludes that plaintiffs' Sixteenth Claim also states a

---

**16.** Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), defines a security, in relevant part, as:

any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, pre-organization certificate or subscription, transferable share, *investment contract,* voting-trust certificate, certificate of deposit for a security, *fractional undivided interest in oil, gas, or other mineral rights,* or, in general, any interest or instrument commonly known as a "security".... (emphasis supplied).

Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), defines a security, in relevant part, as:

any note, stock, treasury stock, bond, debenture, *certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease,* any

collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract,* voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security".... (emphasis supplied).

Although the Exchange Act defines a security as any "certificate of interest or participation in ... any oil, gas or other mineral royalty or lease ...," rather than as "any fractional undivided interest ...," the application of the two definitions does not differ in this case. *See generally* 3 H. Bloomenthal, *Securities And Federal Corporate Law,* § 2.20[1], at 2–105 (1981).

**17.** Defendants Rogers and Oil-Gas also contend that there was no "investment of money," but that plaintiffs merely employed a contractor. This contention begs the question and is without merit.

cause of action under the Federal securities laws.

## STATE LAW CLAIMS

Judge Kelleher exercised his discretion and dismissed plaintiffs' pendent state law claims, granting plaintiffs leave to amend the Complaint to allege an independent basis for jurisdiction over those claims "if any there be . . . ." (Hearing transcript at 30, November 16, 1981.) Plaintiffs now allege that the Court has diversity jurisdiction over the pendent claims against defendants Oil-Gas Equipment and Jerry Rogers.

This Court does not possess diversity jurisdiction unless there is complete diversity of citizenship among *all* adverse parties. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); 28 U.S.C. § 1332. In paragraph 1 of the Proposed Second Amended Complaint, plaintiffs allege that plaintiffs Gordon Johnsen and Lewis Phan are California citizens; in paragraph 9 they allege that defendant Douglas is also a citizen of California. Plaintiffs allege in paragraph 2 that plaintiffs Petro Investment, Inc. and Magoil Investment, Inc. are Nevada citizens; in paragraph 8 they allege that defendant Western Oil is also a Nevada corporation. It is clear from the face of the Proposed Second Amended Complaint that complete diversity does not exist. As no other independent basis of jurisdiction is alleged, the Court denies plaintiffs' motion to include the pendent state law claims.

## THE THIRD CLAIM

In the opposition to defendants' motions to strike and dismiss the First Amended Complaint, plaintiffs did not oppose defendants Douglas' and Western Oil's motions to dismiss several claims against those two defendants—including the Third Claim. Plaintiffs in fact conceded that the Third Claim did not state a cause of action against Douglas and Western Oil. (Opposition at 4, filed November 2, 1981.)

Plaintiffs now seek to include several new paragraphs to the Third Claim in an apparent attempt to state a claim against those two defendants. These paragraphs are practically identical to paragraphs alleged in other claims in the complaint. (28 (same as 44), 29 (same as 55), 30 (same as 101), 32 (same as 45), 33 (same as 56) and 34 (same as 102).) Plaintiffs did not seek leave to amend the Third Claim, nor did the Court grant such leave.

After agreeing to dismiss the Third Claim against Douglas and Western Oil, plaintiffs may not now revive that claim by adding the above noted paragraphs, where these paragraphs are merely repetitious of allegations set forth in other claims.

IT IS SO ORDERED.