779 F.2d 160
 54 USLW 2339, Fed. Sec. L. Rep. P 92,403,
RICO Bus.Disp.Guide 6143
 Bernardo J. PENTURELLI, Appellant,
v.
SPECTOR, COHEN, GADON & ROSEN, ATTORNEYS AT LAW, P.C.;
Edward Cohen; Betsy Cohen; Stephen Sokolic; Richard J.
Abt; Herr, Nicholas & Co.; Ashley Mining Co., Inc.;
Balance Security Programs, Inc.; Alan T. Schiffman; Alan
T. Schiffman & Co., P.C.; Robert R. Herr; George S. Mack;
Steven F. Gadon; Donald R. Sarp; Donald R. Sarp & Company;
Bituminous Coals, Inc.; George D. Visnic; Fetterolf
Mining, Inc., Fetterolf Group, Inc.; Estate of Myron F.
Fetterolf, Deceased; Louis T. Flori; Anthony A.
Dalessandro; Mark Mining No. 2, Inc.; Ely & French
Associates, Inc.; Richard C. Ely.
 No. 85-1129.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 26, 1985.
Decided Dec. 18, 1985.
 
 Henry H. Janssen (Argued), Scott W. Morgan, Rawle & Henderson, Philadelphia, Pa., for appellant.
 Patrick T. Ryan (Argued), Peggy L. Snodgrass, Drinker Biddle & Reath, Philadelphia, Pa., for appellees Richard C. Ely and Ely & French Associates, Inc.
 Allan D. Windt, Spector Cohen Gadon & Rosen, Philadelphia, Pa., for appellees Spector, Cohen, Gadon & Rosen, Edward Cohen, Betsy Cohen, Stephen Sokolic, Richard J. Abt, Balance Security Programs, Inc., George Mack and Steven Gadon.
 Eugene J. Maginnis, Jr., Cozen, Begier & O'Connor, Philadelphia, Pa., for appellees Alan T. Schiffman and Alan T. Schiffman & Co., P.C.
 William F. Kiniry, Jr., Harvey, Pennington, Herting and Renneisen, Ltd., Philadelphia, Pa., for appellees Herr, Nicholas & Co. and Robert R. Herr.
 David E. Tungate, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for appellees Bituminous Coals, Inc., Fetterolf Mining, Inc., Fetterolf Group, Inc., Estate of Myron F. Fetterolf, Louis T. Flori, Anthony A. Dalessandro, and Mark Mining No. 2, Inc.
 Thomas J. Ziomek, Ellen K. Glessner, White and Williams, Philadelphia, Pa., for appellees Donald R. Sarp and Donald R. Sarp & Co.
 Before GIBBONS, SLOVITER and STAPLETON, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 Appellant Bernardo J. Penturelli purchased 28 fractional undivided working interests in the Addison Development, a coal mining operation in Pennsylvania. Claiming to have been defrauded in the sale, Penturelli brought this suit against twenty-five defendants, alleging causes of action under the federal securities law, the Racketeer Influenced and Corrupt Organization Act (RICO), and various state laws. The defendants include a law firm involved in the Addison Development, Spector, Cohen, Gadon & Rosen; plaintiff's accountants, Herr, Nicholas & Co.; the sublessor and developer, Ashley Mining Co., Inc.; the operating manager, Donald R. Sarp; the mining service contractors, including Bituminous Coals, Inc., and others connected with the investment opportunity.[1] The district court dismissed the action for failure to state a claim under either RICO or the securities laws and declined to exercise jurisdiction over the pendent claims. Penturelli v. Spector, Cohen, Gadon & Rosen, P.C., 603 F.Supp. 262 (E.D.Pa.1985).[2]
 
 
 2
 The basis for the court's dismissal of the RICO count was the absence of any allegations of "an injury different in kind from that occurring as a result of the predicate acts themselves" or of "defendants' prior criminal conviction on one of the predicate acts." Id. at 267. On appeal all parties now agree that the district court's dismissal of the RICO claim must be reversed because in Sedima, S.P.R.L. v. Imrex Company, Inc., --- U.S. ----, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court squarely held that a RICO claim "is not deficient for failure to allege either an injury separate from the financial loss stemming from the alleged acts of mail and wire fraud, or prior convictions of the defendants." Id. at 3287. See also Zap v. Frankel, 770 F.2d 24 (3d Cir.1985). Therefore, the only issue presented for decision is whether the "fractional undivided interest" purchased by Penturelli is a security within the meaning of the federal securities laws.
 
 I.
 
 3
 In reviewing the district court's dismissal of this action, we take the allegations of Penturelli's complaint, summarized below, as true.
 
 
 4
 In 1978, defendant Herr, Nicholas, Penturelli's accountant, encouraged him to invest in the Addison Development, an offering of a limited number of sublease rights in coal from specific seams in Addison Township, Somerset County, Pennsylvania. Thereafter, Penturelli was advised by defendant Spector, Cohen, Gadon & Rosen that investment in the Addison Development would result in significant tax benefits. Penturelli was given the Preliminary Private Placement Memorandum (hereafter Preliminary Memo), prepared by defendant Donald R. Sarp, the "Operating Manager" of the Addison Development, which described the investment opportunity.
 
 
 5
 The Preliminary Memo[3] offered to sell sixty fractional undivided working interests in the Addison Development for $67,500 per share to a total of no more than thirty-four persons (subscribers). The coal-bearing land had been acquired in 1978 for less than $100,000 by Bituminous Coals, Inc., a defendant, and ownership had devolved to the Ashley Mining Company, Inc. (AMCI), also a defendant, which had obtained a sublease through a series of transactions. Subscribers were required to sublease the land from AMCI by a document which is described in the Preliminary Memo as "... in actuality, a series of separate agreements with each co-owner conveying to each co-owner a fractional undivided working interest in the Coal Property." App. at 61a. For the sublease, which was for a ten (10) year term with automatic annual renewal until all mineable coal was produced, AMCI received a non-refundable minimum annual royalty of $300,000 in cash and $550,000 in non-recourse promissory notes. Each subscriber was also required to execute simultaneously (1) a development contract with AMCI, (2) a mining services contract with Bituminous Coals, (3) a coal sales agreement with defendant Fetterolf Mining, Inc., and (4) a joint operating agreement with Donald R. Sarp, the accountant for Bituminous Coals, designating him as the Operating Manager.
 
 
 6
 The Preliminary Memo explained that the participants would have certain rights over the conduct of the mining and marketing operations of the development. These rights and the percentage of interests needed to exercise them are set forth in the Joint Operating Agreement and include the following:
 
 
 7
 (1) The right to call a meeting of co-owners (25% of interests);
 
 
 8
 (2) The right to terminate the Joint Operating Agreement (50% of interests);
 
 
 9
 (3) The right to object to the Operating Manager's exercise of his specifically enumerated powers (66 2/3% of interests);
 
 
 10
 (4) The right to advise the Operating Manager concerning ministerial conduct and to audit his accounting (66 2/3% of interests);(5) The right to give or withhold consent to major management decisions, including the borrowing of money, the execution of notes or the commencement of any operations in excess of the minimum needs of the business (50% of interests);
 
 
 11
 (6) The right to reserve a proportionate share of coal to sell for his/her own account (each co-owner).
 
 
 12
 In addition to the rights granted by the Joint Operating Agreement, the investors had the right to terminate the development contract with AMCI on thirty-days notice (50% of interests), and to terminate the mining services contract with Bituminous Coals on ninety-days notice (50% of interests). Finally, the Preliminary Memo makes it clear that each investor was expected to assume unlimited liability.
 
 
 13
 In December 1978, Penturelli purchased twenty-eight of the sixty interests, or 47%, for $560,000 in cash and $1,300,000 in non-recourse notes. He signed all the requisite agreements. According to Penturelli, the defendants subsequently diverted his funds to mine worthless land in Maryland, and his investment is now worthless. In addition, the tax benefits that supposedly were to accompany the investment never materialized and Penturelli claims that he has had to pay over $1,000,000 in additional federal taxes, penalties, and interest because of the investment.
 
 
 14
 Penturelli alleges that the defendants made numerous fraudulent misrepresentations and omissions in connection with the sale of shares in the Addison Development. Thus, for example, Penturelli claims that the defendants knew that mining the Addison Development was not commercially feasible, that they intended from the beginning to divert his investment to the Maryland land, that the defendants knew the purported tax benefits were unlikely to materialize, and that the defendants never intended to return his investment if the development was not completed. Penturelli alleges that these misrepresentations and omissions are the basis for his state law claims and that they constituted violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and SEC rule 10b-5, 17 C.F.R. Sec. 240.10b-5, as well as section 17(a) of the Securities Act of 1933, 15 U.S.C. Sec. 77q(a). Penturelli further claims that the defendants are "controlling persons" within the meaning of sections 20(a) and (b) of the 1934 Act, 15 U.S.C. Sec. 78t(a) and (b).
 
 II.
 
 15
 The district court granted defendants' motion to dismiss the claim based on the Federal Securities Acts on the ground that the interests purchased by plaintiff did not constitute a "security" within the meaning of these acts. The district court acknowledged that "fractional, undivided interest[s] in oil, gas or other mineral rights" are specifically included in the definition of a "security" found in the Securities Act of 1933, 15 U.S.C. Sec. 77b(1),[4] and that the 1934 Federal Securities Act, 15 U.S.C. Sec. 78c(a)(10), defines security to include "Any ... certificate of interest or participation in ... any mineral royalty or lease...." See 603 F.Supp. at 265 n. 1. However, the court interpreted the Supreme Court's precedent, particularly United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), to signify that the statutory definition furnishes only the beginning of the inquiry, and to require that courts look to the economic reality of the interest, and not only to its label. See 603 F.Supp. at 265.
 
 
 16
 In analyzing the interest at issue in this case, the district court used the test articulated in SEC v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), to inquire "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." Id. at 301, 66 S.Ct. at 1104; see 603 F.Supp. at 265. Although the district court acknowledged that the Court could not have meant the word "solely" literally, it held that the investors in the Addison Development had "too much managerial control," and therefore, were "active participant[s]" rather than "passive investor[s]." 603 F.Supp. at 264, 267. Thus, it concluded that the Howey test was not satisfied, and the fractional undivided interests were not securities.
 
 
 17
 Penturelli appeals, contending first, that the district court should not have used the Howey test, but second, that even if the Howey test were appropriate, the interest Penturelli bought qualifies as a security under that test and, therefore, the dismissal of the complaint was erroneous.
 
 III.
 
 18
 In Landreth Timber Co. v. Landreth, --- U.S. ----, 105 S.Ct. 2297, 2303, 85 L.Ed.2d 692 (1985), the Supreme Court noted that its "cases have not been entirely clear on the proper method of analysis for determining when an instrument is a 'security' " for purposes of the Federal Securities Acts. In Landreth and its companion case, Gould v. Ruefenacht, --- U.S. ----, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985), decided late last term, the Court clarified some of the confusion that had arisen concerning the meaning of "security". Specifically the Court repudiated the sale-of-business doctrine, under which some courts of appeals had excepted from the Securities Acts transactions involving the purchase of all, or a controlling portion, of the stock of a business. See Ruefenacht v. O'Halloran, 737 F.2d 320, 321 n. 3 (3d Cir.1984), aff'd Gould v. Ruefenacht, --- U.S. ----, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985).
 
 
 19
 Landreth raised the issue whether the sale of one hundred percent of the stock of a company was subject to the federal securities laws. Gould presented the issue whether the federal securities laws applied to the purchase of fifty percent of the stock of a company when the purchasers simultaneously agreed to participate in the management of the company. The Supreme Court held that both transactions were covered. The Court reasoned that at least with respect to instruments labeled "stock" that also have the traditional characteristics of stock, the plain language of the statute requires that the sale fall within the scope of the Securities Acts. Landreth, 105 S.Ct. at 2302-03. In such a situation, a court may not scrutinize the amount of control that has passed to the purchaser to determine the applicability of the securities laws. Gould, 105 S.Ct. at 2310-11.
 
 
 20
 Although both Landreth and Gould were cases involving sale of "stock", which the court deemed to be "the clearest case for coverage by the plain language of the definition," Landreth, 105 S.Ct. at 2306, much of the reasoning used by the Court is equally applicable to the case before us. First, the Court plainly rejected the view that the economic reality test must be applied to every transaction. The Court explained that the earlier cases in which such an inquiry was made "involved unusual instruments not easily characterized as 'securities'," to which the Securities Acts would apply, if at all, only because the instruments at issue were "of a type that falls within the usual concept of a security." Id. at 2304. Where the instrument, as in Landreth and Gould, was traditional stock, there was no need to look beyond the title and characteristics of the instrument. Id. at 2304-05.
 
 
 21
 Second, the Court limited the Howey economic reality test to "investment contracts," id. at 2305 & n. 5, stating it was not designed to determine whether a particular instrument "fits within any of the examples listed in the statutory definition of 'security'." Id. at 2305 (emphasis in original). If the economic reality test were applied to all of the types of instruments listed in the statutory definition, the enumeration of those instruments would be superfluous. Id.
 
 
 22
 Finally, the Court rejected the contention that Congress intended the federal securities laws to cover only "passive investors." Id. at 2305. It stated that using a control test would contravene the purposes of provisions such as those governing tender offers, disclosure, and recovery of short swing profits.
 
 
 23
 In Gould, the Court elaborated on the policy reasons for rejecting the sale of business doctrine in cases involving the sale of traditional stock in a closely held corporation. It explained that because the control inquiry would be fact specific, the Acts' application at the time of the transaction would be uncertain, and the arbitrary distinctions that evolved would contravene the purpose of the Acts to protect investors. Gould, 105 S.Ct. at 2310-11.
 
 
 24
 Defendants seek to limit the Landreth and Gould holdings to stock. They suggest these cases are inapplicable to the instrument in this case, a "fractional undivided working interest" in leases for coal.
 
 
 25
 As explained by Professor Loss, such an interest arises when a lessee of mineral rights sells parts of its interest in the rights in order to finance the development of the minerals. See L. Loss, Fundamentals of Securities Regulation 184 (1983). These are fractionalized undivided working interests because they give the investor rights to a percentage of the actual minerals "worked" from the lease or the proceeds therefrom and are subject to at least part of the expense of development, operation, or maintenance. Id. Defendants argue that they are not securities because of what defendants' counsel termed at oral argument the "amorphous and intriguing and craftily constructed ways that undivided interests are set forth and then purchased and sold." Although there are a wide variety of financing techniques used by developers in this area, see L. Loss, supra at 186, that fact does not provide a reason to remove such instruments from coverage under the Securities Acts.
 
 
 26
 Significantly, the Securities Acts specifically enumerate a "fractional undivided interest" as a security. See 15 U.S.C. Sec. 77b. Looking to Congress' intent at the time the Federal Securities Acts were passed in 1933 and 1934, the Supreme Court in SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 352, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943), noted that oil and gas rights were "notorious subjects of speculation and fraud." Congress chose not to include leases and assignments because they were indispensable instruments of legitimate oil exploration and production and it wanted to avoid burdening the oil industry by controls that were designed only for traffic in securities. Id. On the other hand, Congress did specifically mention in the Acts the fractional undivided interest, which was "that form of splitting up of mineral interests which had been most utilized for speculative purposes." Id.
 
 
 27
 Defendants have suggested nothing about the interests in Addison Development that make them unusual or substantially different from interests traditionally considered as fractional undivided working interests. See L. Loss, supra at 184. Unlike the cases in which there was an isolated sale or assignment of an unfractionalized interest to one or two individuals, usually to persons who intended to work the land, see, e.g., Robertson v. Humphries, [1979-1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 97,283 (10th Cir.1978); Ballard & Cordell Corp. v. Zoller & Danneberg Exploration Limited, 544 F.2d 1059 (10th Cir.1976), cert. denied, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1060 (1977); Fearneyhough v. McElvain, 598 F.Supp. 905 (C.D.Ill.1984); see also Parvin v. Davis Oil Co., 524 F.2d 112 (9th Cir.1975), here the transaction involved the sale of fractional interests to many investors. Defendants have cited to no case in which fractional interests in minerals sold to numerous investors were held not to be securities.[5] We do not understand the defendants to deny the fact that shares in the Addison Development were intended as an investment, albeit one that was designed to produce a tax benefit to the investors.
 
 
 28
 The Securities and Exchange Commission, the agency that has the responsibility for enforcement of the Securities Acts, which has the statutory power to exempt certain securities from the Acts, see 15 U.S.C. Sec. 77c(b), has instead officially affirmed that it regards interests precisely like those at issue in this case as securities within the statute. In a 1977 Release, the SEC expressed concern regarding the sale to the public of interests in coal related ventures, much like that of Addison Development. It stated:
 
 
 29
 These investments usually take the form of partnership interests or fractional undivided working interests. Many of these investments essentially offer interests in a lease conveying coal property and the subsequent mining and sale of coal produced therefrom, in return for a cash investment and the passing of a non-recourse note to the lessor of the coal property. These investments purport to offer substantial present tax benefits and future distribution of profit.
 
 
 30
 These interests in coal are securities as defined under the Federal securities laws and are therefore subject to the anti-fraud provisions of such laws and, absent exemption, to the registration, provisions as well.
 
 
 31
 Exchange Act Release No. 14273 [1977-1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 81,387 (December 15, 1977) (emphasis added).
 
 
 32
 Moreover, the interests in the Addison Development were characterized as securities in documents relating to the transactions. In the Preliminary Memo, there are numerous references to the securities nature of the interest offered. The Preliminary Memo included a Questionnaire to investors which refers to an SEC rule governing private offerings and sale of "securities" and states that it elicits the requested information to insure the exemption of the offering from the registration requirements of the Securities Act of 1933. The Preliminary Memo informs the offerees that they have rights to information pursuant to the 1933 Act, and makes several references to limitations on the offerees' later resale and transfer because of provisions of the Securities Acts and rules thereunder. All of this serves to reenforce the conclusion we reach that the instrument at issue was a security.
 
 
 33
 The Supreme Court cases upon which the district court relied for the contrary conclusion have been distinguished by that Court in Landreth. The decision in United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), that stock in a corporation that entitled the buyer to lease a cooperative apartment was not a security, was explained in Landreth as involving an interest bought for "personal use," and not, despite the label, as a sale of "stock" in the traditional sense.
 
 
 34
 In SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), and SEC v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed.2d 1244 (1946), the Court had "looked to the economic substance of the transaction rather than just to its form" only because the transactions "involved unusual instruments not easily characterized as 'securities'." 105 S.Ct. at 2303-04. The Joiner transaction involved sale of leasehold interests in land near a proposed oil well drilling, rather than a fractional undivided interest which is involved in this case. Howey involved an offering of units of a citrus grove development coupled with a contract for cultivating and marketing the fruit and remitting the proceeds to the investors. Both were held to be securities because they were deemed to be "investment contracts", a somewhat amorphous term. This did not mean, as explained in Landreth, that courts faced with an instrument falling squarely within another statutory definition must also apply the economic reality inquiry.
 
 
 35
 It follows that if any inquiry other than whether the instrument fits the statutory definition is appropriate, it would be whether the instrument and transaction fit the traditional characteristics of the defined term, or whether, as discussed in Ruefenacht v. O'Halloran, 737 F.2d at 332-37, the reasons and policies that gave rise to protection of securities under the 1933 and 1934 Acts are applicable. As we stated above, both inquiries lead to an affirmative response in this case.
 
 
 36
 Defendants rely primarily on the rights, responsibilities and control which the transaction vested in Penturelli and the co-investors as the basis for their argument that plaintiff should be treated as a co-owner rather than as a passive investor in securities. They point particularly to the necessity for consent and concurrence of the investors to take major action with respect to the development, their unlimited liability to third parties, and the right of each to reserve his or her share of coal and sell it as each saw fit. Defendants argue that it is irrelevant that Penturelli did not use these incidents of control. There are two responses to defendants' argument, either of which would be dispositive. First, Landreth and Gould disavow use of a passive investor test or a management or control inquiry to determine whether stock is a security and we see no reason why that would not also be true of the fractional undivided interest, also enumerated in the statutory definition. We need not decide whether passivity or control would be relevant in determining whether a transaction is an "investment contract" within the Securities Acts, because that is not the issue before us.
 
 
 37
 Second, the transaction, as reflected in the Preliminary Memo, was structured so that control, at least at the time of the investment, was illusory. The fractional interests could be purchased only as part of a pre-planned sophisticated project that included the prearranged development, service and sales contracts funded by investors without experience or facilities in coal mining or coal sales. Since almost all of the cash was dispersed at the time of the closing of the investment, in reality the right to control vested in the investors at that time was illusory.[6]
 
 
 38
 Thus we conclude as a matter of law that the fractional undivided working interest in the Addison Development acquired by plaintiff were securities covered by the anti-fraud provisions of the Federal Securities Acts.
 
 IV.
 
 39
 For the reasons set forth above we reverse the district court's order dismissing the complaint. The reasons given by the district court for dismissal of the RICO count and the federal securities acts counts cannot stand in light of subsequently decided Supreme Court cases. Because the district court dismissed the pendent state law counts as a result of its dismissal of the federal counts, that dismissal will also be reversed. The case will be remanded to the district court for further consideration and proceedings. On remand, the court may of course consider whether the statute of limitations bars any part of this action, an issue which it left open in its earlier decision, as well as any other grounds for dismissal asserted by the defendants in their various motions to dismiss.
 
 
 
 [1]
 Other defendants include individuals connected with the defendant firms and companies; the syndicate manager and underwriter of the Addison Development, Balance Security Programs, Inc.; Donald Sarp's firm, Donald R. Sarp & Co.; Alan T. Schiffman and Alan T. Shiffman & Co., P.C., who served as accountants to the project; Fetterolf Group, Inc., the estate of its owner, and two of its officers; Mark Mining No. 2, Inc.; and Ely & French Associates, Inc., a geology and engineering firm. Hereafter all defendants will be discussed collectively unless otherwise noted in the text
 
 
 [2]
 An attempt to transfer some or all of the claims to a Pennsylvania state court pursuant to 42 Pa.Cons.Stat.Ann. Sec. 5103 was apparently unsuccessful. No party suggests that the putative transfer affects our jurisdiction in any way
 
 
 [3]
 The parties agree that the Preliminary Private Placement Memorandum can be considered as part of the complaint, and thus it was properly before the district court for consideration in the motion to dismiss
 
 
 [4]
 The statutory definition as a whole is as follows:
 The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.
 15 U.S.C. Sec. 77b(1).
 
 
 [5]
 Various courts have affirmed the securities nature of a fractionalized undivided interest in oil, gas or other minerals using a variety of tests. See, e.g., San Francisco-Oklahoma Petroleum Exploration Corp. v. Carstan Oil Co., 765 F.2d 962 (10th Cir.1985); Nor-Tex Agencies, Inc. v. Jones, 482 F.2d 1093 (5th Cir.1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873 (1974); Gilbert v. Nixon, 429 F.2d 348 (10th Cir.1970); Woodward v. Wright, 266 F.2d 108 (10th Cir.1959); Johnsen v. Rogers, 551 F.Supp. 281 (C.D.Cal.1982); Bayoud v. Ballard, 404 F.Supp. 417, 422 (N.D.Tex.1975)
 
 
 [6]
 The decisions relied on by the district court, see Goodwin v. Elkins & Co., 730 F.2d 99 (3d Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 118, 83 L.Ed.2d 61 (1984); Lino v. City Investing Co., 487 F.2d 689 (3d Cir.1973), involved transactions in which the investor had significantly greater participation in the projects underlying the investment than Penturelli had in the Addison Development. See Goodwin, 730 F.2d at 111-14 (Seitz, C.J. and Becker, J., concurring); Lino, 487 F.2d at 693