ELYSIAN FEDERAL SAVINGS
BANK, Plaintiff,

v.

FIRST INTERREGIONAL EQUITY
CORPORATION, First Interregional
Gvm't Securities, Inc. and Charles Beli-
na, Defendants.

Civ. A. No. 88–3528.

United States District Court,
D. New Jersey.

May 11, 1989.

Seth T. Taube, McCarter & English, Newark, N.J., for plaintiff.

Nicholas W. McClear, Wilentz, Goldman & Spitzer, Woodbridge, N.J., for defendants.

## OPINION AND ORDER

LECHNER, District Judge.

Succinctly stated, in this action plaintiff has alleged the defendants committed fraud by charging plaintiff excessive mark-ups in the sale of two types of securities: collateralized mortgage obligations ("CMOs") and principal only trust certificates ("PO Trusts"). Plaintiff claims the aggregate amount of the excessive mark-ups exceeds $5 million. In addition, it is charged defendants have attempted to conceal the excessive mark-ups. While a significant number of the legal issues presented in this matter can be adequately addressed against the backdrop of this terse summary of plaintiff's first amended complaint (the "Current Complaint"), certain of the legal claims involve consideration of additional facts. These additional facts, although not voluminous or complicated, are set forth together with a discussion of the individual legal theories which make them relevant.

Defendants filed a motion to dismiss, on various grounds, several counts contained in the Current Complaint. Simultaneously, plaintiff has made a motion to file a second amended complaint (the "Amended Complaint") which (1) drops certain of the claims defendants seek to have dismissed in their motion, (2) seeks to include claims for relief based on additional legal theories, and (3) seeks to add certain detail, the absence of which defendants claim justifies dismissal of various counts in the Current Complaint.

As to the counts in the Current Complaint which have not been voluntarily dismissed, plaintiff has strongly opposed defendants' motion to dismiss. As to plaintiff's motion to further amend the Current Complaint, defendants have strenuously argued, among other things, the new counts sought to be included fail to state a claim as a matter of law. While there are a variety of issues raised by the present motions, each of which will be addressed be-

low, this opinion primarily addresses the viability of various legal theories for recovery on the relatively straightforward facts of this case.

More specifically, (and setting aside for the moment the assertions sought to be added in the Amended Complaint, because of defendants' motion to dismiss[1] and further review by plaintiff[2] of the issues involved) plaintiff's remaining claims which with the exception of one transaction continue to be the subject of defendants' motion to dismiss can be listed as follows:

(1) claims based on Section 10(b) of the Exchange Act and Rule 10(b)–5 for all CMO and PO Trust transactions;

(2) claims based on Section 12(2) of the Securities Act for CMO transactions only;

(3) control person liability claims pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o for claims based on the CMO transactions only; and

(4) control person liability claims pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) for all CMO and PO Trust transactions.

---

**1.** In their original moving papers, defendants made a motion pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss plaintiff's claims based on Section 12(2), 15 U.S.C. § 77l(2), and Section 17(a), 15 U.S.C. § 77q(a), of the Securities Act of 1933 (the "Securities Act") and Rule 10(b)–10, 17 C.F.R. § 240.10b–10 promulgated under Section 10(b), 15 U.S.C. § 78j(b), of the Securities Exchange Act of 1934 (the "Exchange Act") in their entirety, and all but one of plaintiff's claims based on Rule 10(b)–5, 17 C.F.R. 240.10b–5, Section 15 of the Securities Act, 15 U.S.C. § 77o, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) for failure to state a claim upon which relief may be granted.

**2.** In the Current Complaint plaintiff sought relief on various federal statutory and pendent state common law and statutory grounds, including:

(1) violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) (First Count, paragraph 34; Second Count, paragraph 39);

(2) violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and violations of Rule 10(b)–5, 17 C.F.R. § 240.10b–5 (First Count, paragraph 34);

(3) failure to disclose excessive markups as required by Rule 10(b)–10, 17 C.F.R. 240.10b–10 (Third Count, paragraph 47);

As discussed below, defendants' opposition to plaintiff's motion to amend will, in large part, be treated as a motion to dismiss the new claims sought to be asserted which include claims under RICO, the New Jersey counterpart and of aiding and abetting. For the reasons that follow, defendants' motion to dismiss is denied in all respects; plaintiff's motion to file the Amended Complaint is granted.

*Discussion*

I. Dismissal Standard

Virtually all aspects of this matter will be treated under the standards applicable to Rule 12(b)(6) motions. In that connection, the Supreme Court stated in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957):

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Id.* at 45–46, 78 S.Ct. at 101–102. *Accord, Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct.

---

(4) violations of Section 12(2) of the Securities Act, 15 U.S.C. § 77l(2), (Fourth Count, paragraph 49);

(5) control person liability pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and respondent superior (Fifth Count);

(6) Uniform Securities Act violations under N.J.S.A. 49:3–71(a)(2) (Sixth Count);

(7) Uniform Securities Act vicarious liability (Seventh Count);

(8) common law fraud (Eighth Count);

(9) breach of fiduciary duty (Ninth Count);

(10) unjust enrichment (Tenth Count);

(11) negligence (Eleventh Count); and

(12) successor liability and piercing the corporate veil (Twelfth Count).

On February 17, 1989, however, plaintiff served defendants with a *notice of motion to* file the Amended Complaint, which, among other things, seeks to add causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964 *et seq.,* and its state counterpart, N.J.S.A. 2C:41–4, and to withdraw the claims based on Section 17(a) and Rule 10(b)–10.

1079, 1081, 31 L.Ed.2d 263 (1972); *Angelastro v. Prudential–Bache Securities*, 764 F.2d 939 (3d Cir.1985), *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1986). Indeed, the Supreme Court has stated that a Rule 12 motion should not succeed unless the complaint is found to be "wholly frivolous." *Radovich v. National Football League*, 352 U.S. 445, 453, 77 S.Ct. 390, 395, 1 L.Ed.2d 456 (1957). As articulated in this Circuit, the standard to be applied in a motion under Fed.R.Civ.P. 12(b)(6) is whether, after construing the pleading in the light most favorable to the plaintiff and resolving every doubt in favor of the plaintiff, the pleading states any valid claim for relief. *Mortensen v. First Federal Savings and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977).

With respect to at least two aspects of this matter—the allegations concerning plaintiff's knowledge of the excessive markups and the related issue of statute of limitations accrual—submissions in addition to the pleadings have been presented. To this limited extent defendants' Rule 12(b)(6) motion will be treated as a motion for summary judgment under Rule 56.[3]

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Elec. Industrial Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted).

The Court elaborated on the standard in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted): "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986) (footnote omitted): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative

---

**3.** The Federal Rules of Civil Procedure provide that a Rule 12(b)(6) motion to dismiss for failure to state a claim shall be converted to a motion for summary judgment under Rule 56 whenever matters submitted outside the pleading are considered by the court. Fed.R.Civ.P. 12(b). The relevant part of the rule reads as follows:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are

presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b). It is noted both parties had the opportunity to present materials relevant to a summary judgment motion on this specific issue. *See Rose v. Bartle*, 871 F.2d 331, 340–41 (3d Cir.1989).

burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed. R.Civ.P. 56(e).

## II. Statute of Limitations under Section 10(b) of the Exchange Act and Rule 10(b)–5 thereunder

Plaintiff purchased PO Trusts from defendants in May, June and August, 1987, and purchased the CMOs from defendants in a number of transactions during 1986. *See* footnote 8, *infra.* Plaintiff argues that, because the excessive mark-ups were not disclosed by defendants, it did not know it was being charged excessive mark-ups at the time of the transactions. In September, 1987, plaintiff, with the intervention of the Federal Home Loan Bank Board ("FHLBB"), retained Rochester Consulting Associates ("Rochester Consulting") in order to assist in the operations and management of the business. According to the deposition testimony of Peter Gensicke ("Gensicke"), former Chief Financial Officer of plaintiff, William Vail ("Vail") of Rochester Consulting asked Gensicke to prepare computer printouts of certain PO Trust and CMO transactions so that Vail could "check out" the prices for those securities.

Less than one year later, in August, 1988, Elysian filed its suit asserting claims under, among other things, Section 10(b) of the Exchange Act. Section 10 provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Subsequent to passage of the Exchange Act, the SEC promulgated Rule 10(b)–5, providing that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. To prevail in an action brought under Rule 10(b)–5, a plaintiff must establish six elements: (1) a false representation of (2) a material (3) fact; (4) defendant's knowledge of its falsity and his intention that plaintiff rely on it; (5) the plaintiff's reasonable reliance thereon; and (6) his resultant loss. *See Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986); 3 Loss, *Securities Regulation* 1431 (1961). Defendants have not attacked the viability of the Rule 10(b)–5 claims on the basis that any of the foregoing requirements were not met. Instead, defendants claim the Rule 10(b)–5 claims have been asserted too late.

### Statute of Limitations Period

The Third Circuit recently held in *In re Data Access Systems Securities Litigation,* 843 F.2d 1537 (3d Cir.1988) (en banc), *cert. denied sub nom., Vitiello v. I. Kahlowsky & Co.,* —— U.S. ——, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988), that the applicable statute of limitations for Section 10(b) and Rule 10(b)–5 claims is one year after discovery of the violation and in no event more than three years after the violation. Defendants argue that all but one of plaintiff's claims are time-barred because plaintiff has failed to bring suit within one year after the violation and plaintiff has failed

to plead any facts showing when it discovered the violation.[4]

Before addressing whether the Rule 10(b)–5 claims were timely under the holding of *Data Access* because the original complaint was filed within one year of plaintiff's discovery of the excessive mark-ups (and also within three years of the date of the transactions), it is interesting to consider a novel argument advanced by plaintiff in this case. According to plaintiff, the statute of limitations rule recently articulated in *Data Access* (within one year of discovery, but in no event more than three years after an alleged violation) should be deemed to be modified as a result of the enactment of the Insider Trading and Securities Fraud Enforcement Act of 1988 ("Insider Trading Act"), P.L. 100–704, 102 Stat. 4677 (1988).

Congress has basically amended the Exchange Act to expressly provide a private right of action for contemporaneous buyers and sellers asserting claims of fraud committed through insider trading. Because Congress selected a five-year statute of limitations period for insider trading cases and because insider trading is a specific type of activity prohibited under Section 10(b) and Rule 10(b)–5, plaintiff argues that, under the court's reasoning in *Data Access*, the five-year period should govern all claims under Section 10(b).

In *Data Access* the court was attempting to establish a single statute of limitations period for all claims under Section 10(b) and Rule 10(b)–5.[5] Plaintiff notes that at the time of the decision in *Data Access*, Congress had not established a limitations period for Section 10(b) claims and the court had to decide which was the "*one most appropriate*" statute of limitations. It is now argued that "[s]ince the decision in *Data Access*, Congress *has* now spoken and selected a five-year statute of limita-

tions to govern at least one type of claim brought under § 10(b)." Plaintiff's Brief, p. 7.

While it is not necessary to rule on this novel argument made by plaintiff (because it appears able to survive defendants' motion to dismiss under the shorter statute of limitations previously articulated in *Data Access* ), certain observations are made. First, although it appears the argument has never been squarely presented, it is noted the statute of limitations rule enunciated in *Data Access*, even after the Insider Trading Act was enacted, has not been modified. *Bloch v. Prudential–Bache Securities*, 707 F.Supp. 189 (W.D.Pa.1989); *Ferreri v. Mainardi*, 1989 WL 11071 (E.D.Pa. Feb. 1989); *T.R. Whitelyn Holstein Breeder Associates v. Whitelyn Farms, Inc.*, 1988 WL 136464 (E.D.Pa. Dec. 16, 1988).

Second, and more importantly, it appears plaintiff seeks a ruling on this issue which would be one based upon form rather than substance. It is arguable the Third Circuit's central goal in *Data Access* was to establish a uniform statute of limitations to govern all claims under Section 10(b). It does not necessarily follow, however, that it is appropriate to articulate a uniform statute of limitations period based merely upon Congress' enactment of a statute of limitations period for a particular violation of the securities laws which happens to be a species of a Section 10(b) claim.

Although uniformity may have been an objective generally, a primary analytical goal in *Data Access* was to determine whether, under Section 10(b) and Rule 10(b)–5, there was a federal statute of limitations more closely analogous than the state statutes courts previously "borrowed". In connection with this exercise, the Third Circuit was comfortable turning

---

**4.** The one claim which defendants appear to concede was timely asserted concerns the purchase of PO Trust 7, which was acquired by plaintiff in August, 1987 (within one year of the filing of the original complaint).

**5.** The Third Circuit explained:

> We therefore conclude that the caselaw in this court now suggests in Section 10(b) and

Rule 10b–5 actions the same determination it made in RICO cases: the courts must select "the *one* most appropriate statute of limitations for *all* civil [Section 10(b) and Rule 10b–5] claims."
843 F.2d at 1544 (*quoting Malley–Duff & Associates, Inc. v. Crown Life Ins. Co.*, 792 F.2d 341 (3d Cir.1986)) (emphasis in original text).

to those sections of federal securities law that are "companion provisions" to Section 10(b). In comparing these sections, the court stated:

> Both section 10(b) and its companion provisions—§ 9(e) (manipulation of security prices); § 16(b) (profits from purchase and sale of securities within six months); § 18(c) (liability for misleading statements in any application, report, or filed document); and § 29(b) (validity of contract provisions in violation of Act or regulations thereunder)—are aimed at the same objectives. All of these companion provisions, except section 16(b), have a uniform federal limitations period. All reflect, in common with section 10(b), the purpose of the original Securities Act of 1933:
>
>> to "provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof, and for other purposes."
>
> *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 728, 95 S.Ct. 1917, 1921, 44 L.Ed.2d 539 (1975) (quoting 1933 Act); *see Basic Inc. v. Levinson*, [485] U.S. [224], 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). All aim to compensate the same type of injury. All are designed to fill a void in the common law and to create remedies that would be uniform throughout our nation's commercial universe, instead of being subjected to the vagaries of independent and diverse state statutory regulations.

*Data Access*, 843 F.2d at 1548.

It appears from the foregoing the Third Circuit was most interested in considering the precise nature of the claim asserted under section 10(b). It is doubtful the Circuit would have automatically endorsed, without a reasoned analysis, a five year

statute of limitations period for all claims arising under section 10(b)[6] merely because Congress established such a limitations period for a specific type of conduct proscribed by Section 10(b).

Turning to the nature of the Section 10(b) claims asserted in this case, it appears they are more similar to claims under the "companion provisions" referred to above than to a claim under the Insider Trading Act. This case involves the alleged failure by the defendants "to provide full and fair disclosure," *Data Access*, 843 F.2d at 1548, concerning the amount of the markups for the PO Trust and CMO transactions.

The objectives of the Insider Trading Act are well summarized in defendants' brief. A primary purpose of the legislation was to restore public confidence in the fairness and integrity of the securities markets. House Report No. 100–910, 100th Cong., 2d Sess at 7, U.S.Code Cong. & Admin.News 1988, p. 6043 ("House Report"). Although an express private cause of action for contemporaneous traders was created, the thrust of the legislation was to protect the public at large, and not just individual investors. *Id.* Professor James Cox of Duke University School of Law testified at the House Hearings on July 11, 1988 and explained insider trading violations are different in nature from other "typical securities law violation[s]."

*Insider Trading Invites Novel Detection Techniques:*

The proposal in section 21A(e) introduces a very novel device into the enforcement of the insider trading. The appropriateness of this provision is best understood by considering the important difference between the standard securities law violation and insider trading. To be sure, the public would be well served by devices that would encourage earlier reve-

---

**6.** The extreme nature of the modification plaintiff seeks to have made to the current statute of limitations structure is revealed by the proposed elimination of the "two-tiered" concept. The statute of limitations under *Data Access* is one year from discovery but in no even more than three years from date of violation; the statute of limitations for insider trading claims is a flat five years. In essence, plaintiff is asking this

court to disturb an intricate structure which doubtless involves the balancing of numerous considerations. Here, plaintiff did not run afoul of the three year maximum period under *Data Access*. Defendants argue plaintiff failed to bring the lawsuit within one year of discovery or the time discovery should have occurred with reasonable diligence.

lations of all securities law violations such as "cooked books" or market manipulations. However, in each of those cases the violation causes a very distinct, observable, and tangible harm. This feature of the typical securities law violation not only facilitates detection of a violation (the person so harmed complains), but this feature also stimulates in most instances the private party to sue even before a government prosecution, if any, is commenced.

In contrast with the standard misrepresentation or manipulation cases, the victim of insider trading or tipping is frequently problematic. And except in the rare cases ... the private party (i.e., contemporaneous traders in most cases), rarely initiates suit until the government prosecution has attracted the private litigant's attention. *See* Dooley, Enforcement of Insider Trading Restrictions, 66 Va.L.Rev. 1 (1980). Enforcement of illegal inside trading and tipping therefore is primarily by the government and for the purpose of the public, rather than private, injury. The lower likelihood of a victim tangibly harmed reduces the likelihood as well of public complaints that will lead to government enforcement actions.

July 11, 1988 Testimony before the Subcommittee on Telecommunications and Finance of the U.S. House of Representatives Committee on Energy and Finance, p. 7.

The House Report explained the unique need for a five year statute of limitations for insider trading claims.

It also came to the attention of the Committee that part of the problem in deterring and punishing insider trading violations is the difficulty of effectively prosecuting these cases. The biggest obstacle is making the vital connection between an investor and the possession of insider information (i.e., what he knew, when he

knew it and how he found it out). Unless there is an obvious connection, which is rare, the success of the case usually depends on getting someone who knows about the insider trading to talk. According to the testimony of U.S. Attorney Giuliani, there are generally two people who can provide direct evidence that insider trading has occurred—the source of the information and the trader. It is very rare for one of these two persons to admit that they have engaged in insider trading. Most cases are based largely on circumstantial evidence. Because insider trading is so sophisticated and secretive, technical computer surveillance can only go so far in investigating crimes. In order to develop these cases effectively, information provided by other individuals who have relevant knowledge of the circumstances may prove essential.

House Report at p. 15, U.S.Code Cong. & Admin.News 1988, p. 6052.

The particular difficulty of discovering the fraud involved in insider trading cases does not exist in other types of securities fraud cases where the injury is more direct. Where an injury is more able to be determined (because there exists a party who has been directly injured), *Data Access* has made it clear there is a policy in favor of limiting the length of time for bringing a securities fraud lawsuit. The *Data Access* court cited a Seventh Circuit opinion where it was stated:

The legislative history in 1934 makes it pellucid that Congress included statutes of repose because of fear that lingering liabilities would disrupt normal business and facilitate false claims. It was understood that the three-year rule was to be absolute.[7]

843 F.2d at 1546 (citing *Norris v. Wirtz,* 818 F.2d 1329, 1332 (7th Cir.), *cert. denied,*

---

7. *Data Access* also cited *Roberts v. Magnetic Metals Co.,* 611 F.2d 450, 463 (3d Cir.1979) (Seitz, C.J., dissenting), on this issue:

After the plaintiff has notice, there is a strong federal interest in requiring him to file suit quickly. First, an early action will alert other shareholders to possible misconduct in the

affairs of the corporation. Second, the shorter period permits the company's management to treat a given securities transaction as closed, allowing them to proceed more confidently with running the company.

*Data Access,* 843 F.2d at 1546.

—— U.S. ——, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987)).

While plaintiff's argument that the Third Circuit's decision in *Data Access* should be disregarded in this case is less than compelling, it is not necessary, as indicated, to rule on this argument. It appears more traditional grounds exist to deny defendants' motion to dismiss based upon the applicable statute of limitations, as established in *Data Access.*

### Within One Year of Discovery

■ Under *Data Access,* plaintiff is required to bring suit within one year of discovering the undisclosed, excessive markups, but in no event more than three years after the transactions. As to the latter aspect of the rule, the original complaint was filed within three years of the various transactions.[8]

On the issue of whether plaintiff satisfied the aspect of the rule which requires claims to be asserted within one year of discovery, defendants argue the statute of limitations begins to run not when plaintiff had actual knowledge of the violation, but rather when plaintiff should have known of the violation after exercising reasonable diligence. *Bradford–White Corp. v. Ernst & Whinney,* 699 F.Supp. 1085, 1091 (E.D. Pa.1988). It is further argued the first step in determining whether a plaintiff should have known of possible wrongdoing is whether there were any "storm warnings." *Gruber v. Price Waterhouse,* 697 F.Supp. 859, 863–864 (E.D.Pa.1988) ("Once on inquiry notice, plaintiffs have a duty to exercise reasonable diligence to uncover the basis for their claims and are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period.") According to defendants, "the plaintiff cannot ignore storm warnings and await the leisurely discovery of [their] claims." *Bradford–White Corp.,* 699 F.Supp. at 1091.

It has been held that in determining whether a plaintiff exercised due diligence in investigating fraud, factors to be considered include "the existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings." *Cotton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 699 F.Supp. 251 (N.D.Okla.1988).[9] It might be

---

8. The original complaint was filed on August 16, 1988. The individual transactions now in dispute occurred as follows:

   (1) In January, 1986—3 CMO transactions;
   (2) In March, 1986—6 CMO transactions
   (3) In April, 1986—2 CMO transactions;
   (4) In May, 1986—7 CMO transactions;
   (5) In June, 1986—1 CMO transaction;
   (6) In July, 1986—2 CMO transactions;
   (7) In September, 1986—3 CMO transactions;
   (8) In October, 1986—1 CMO transaction;
   (9) In November, 1986—2 CMO transactions;
   (10) In January, 1987—3 CMO transactions;
   (11) In March, 1987—2 CMO transactions;
   (12) In May, 1987—1 PO transaction;
   (13) In July, 1987—1 PO transaction;
   (14) In August, 1987—1 PO transaction.

9. As a procedural matter, defendants argue the statute of limitations provisions found in Sections 13, 9(e), 18(c) and 29(b) all require the plaintiff to affirmatively plead facts showing compliance with these sections. *See Morgan v. Kobrin Securities, Inc.,* 649 F.Supp. 1023, 1027 (N.D.Ill.1986); *Kroungold v. Triester,* 407 F.Supp. 414, 419 (E.D.Pa.1975); *Rosenberg v. Hano,* 26 F.Supp. 160 (E.D.Pa.1938); absent such pleading, claims are subject to dismissal for failure to state a claim. *Rosenberg,* 26 F.Supp. at 161. It is further argued that when a statute of limitations section is borrowed, it is borrowed in its entirety, including provisions such as tolling provisions which are inseparable from the limitations period itself. (Citing *Chardon v. Fumero Soto,* 462 U.S. 650, 657, 103 S.Ct. 2611, 2616, 77 L.Ed.2d 74 (1983); *Board of Regents v. Tomanio,* 446 U.S. 478, 483–86, 100 S.Ct. 1790, 1794–96, 64 L.Ed.2d 440 (1980)). Finally, defendants argue because the rule concerning time was borrowed from *Data Access,* the pleading requirements should be adopted as well. *See Johnson v. Railway Express Agency,* 421 U.S. 454, 464, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975) ("In virtually all statutes of limtiations the *chronological length* of the limitations period is interrelated with provisions regarding tolling, revival and questions of application.")

Plaintiff argues the cases cited by defendants involved provisions of the securities laws other than § 10(b) where, unlike with § 10(b), assertion of a claim within a specific time period was an express pre-condition imposed as part of the statutory scheme. *See In re Longhorn Securities Litigation,* 573 F.Supp. 255, 266 (W.D.Okla.1983) (holding that the procedural requirements for

fair to say that plaintiff, a savings institution employing investment professionals, had a "position in industry" permitting it to detect the fraud. It is noted, however, one of plaintiff's primary allegations is that defendants sought to conceal the fact excessive markups were being charged. On the issue of "knowledge of related proceedings" it appears plaintiff has become aware of other instances of excessive markups being charged by defendants. Indeed, in a prior motion brought by defendants, a request to strike references in the Current Complaint to unrelated SEC and NASD investigations of defendants was denied. *See* Order, dated December 29, 1988. It remains unclear exactly when plaintiff learned of defendants' potentially disreputable business practices and to what extent they constituted "storm warnings" in this case.

While cases have construed the one year from discovery rule as requiring some form of due diligence once "storm warnings" exist, defendants perhaps overstate plaintiff's obligations in this case when they assert "plaintiff must include specific factual allegations of the reasons why discovery was not made sooner and what steps plaintiff took to discovery the alleged fraud." Defendants' Reply Brief, p. 13. The gravaman of the Amended Complaint is that defendants fraudulently charged undisclosed, excessive mark-ups on the PO Trust and CMO securities. Paragraph 35 of the Amended Complaint alleges:

35. Elysian did not discovery defendants' fraudulent conduct until after August of 1987 when, with the guidance of the Federal Home Loan Bank Board, the management of Elysian was changed and Rochester Consulting Associates

("RCA") was retained to assist Elysian in its operations. At that time, Elysian's portfolio of securities was reviewed. In December of 1987 or January of 1988, representatives of RCA asked Gensicke to determine whether Elysian had been charged excessive mark-ups by defendants in connection with the purchase of the POs and CMOs. Following this investigation, Elysian concluded that defendants had charged it excessive mark-ups.

*Id.* Defendants argue this allegation (which, under the Rule 12(b)(6) standard, is to be resolved generously in favor of plaintiff) is not sufficient because it fails to explain why plaintiff did not discover the excessive markups earlier. However, Paragraph 35, read liberally, contains an allegation to the effect there were no "storm warnings" until late 1987, after Rochester Consulting arrived on the scene. In addition, it is more than implicit from the above allegation that plaintiff was previously suffering operating difficulties. It was in need of FHLBB assistance to successfully manage the bank's affairs. Defendants' suggestion that this might be an invalid reason for not discovering fraud earlier implies a notion that perpetrators of fraud have expanded rights to take advantage of mismanaged entities.

Quite apart from the illogical nature of defendants' argument they should somehow be rewarded for successfully concealing their allegedly fraudulent conduct, at this time there is no evidence in this case that plaintiff had the benefit of "storm warnings" and simply ignored them. At oral argument, defendants' counsel was unable to point to any specific event which

the express causes of action did not apply to an implied cause of action under Section 10(b) and Rule 10(b)–5). Plaintiff argues a statute of limitations defense is an affirmative defense that must be pled by the defendant, not the plaintiff. *FDIC v. Cardona,* 723 F.2d 132 (1st Cir.1983).

This question concerning the affirmative pleading requirements, although interesting, need not be decided in this case. Plaintiff has moved to file the Amended Complaint which sets forth the relevant facts demonstrating the timeliness of the Section 10(b) claims. As discussed, *infra,* plaintiff's motion to further

amend the Current Complaint is granted. Defendants have also argued that plaintiff's claims under Section 12(2) of the Securities Act are barred for failure to plead compliance with the applicable statute of limitations. While it is more apparent plaintiff has an affirmative pleading obligation with respect to Section 12(2) claims, this issue is moot for the same reason that plaintiff shall be filing the Amended Complaint. The content of "new paragraph 35" is discussed below in connection with the Section 10(b) claims, but is equally relevant to the Section 12(2) claims.

would have provided cause to believe overcharges had occurred in this case.

Gensicke unequivocally testified that the first person to suspect the defendants had charged excessive mark-ups to plaintiff was Vail, who was hired by plaintiff at the suggestion of Rochester Consulting, the consulting group which took over management of plaintiff after August, 1987.[10] Thus, it appears the "storm warnings" came in December, 1987;[11] plaintiff commenced this action less than one year later.

Defendants make reference to a memo by Vail, which states:

> Called Mark Chaplin and indicated this error in our CMO work. Both agreed that it is immaterial and the redoing of the CMO calculation would be unnecessary at this time. Also discussed with Mark Lynelle's comment that the Travelers Series C CMO had never traded above 107. Elysian had been charged approximately 114 by InterRegional. There appears to be more and more evidence or prive gouging by the broker of First InterRegional. Currently is a backburner item but someone will eventually need to pursue this problem.

Memorandum from Vail concerning "Summary of Activities of October 14, 1987," dated October 25, 1987. It may be true this is the type of specific "storm warning" which should have triggered an investigation by plaintiff and in fact it appears an investigation did take place. As indicated, Vail was hired by plaintiff at the suggestion of Rochester Consulting (which took over the management of Elysian after August, 1987). It was in December, 1987 that Vail requested a computer printout of certain PO Trust and CMO transactions. No compelling evidence, other than general suggestions that perhaps defendants should be treated with caution, has been submitted to demonstrate plaintiff had knowledge of possible overcharging more than one year before this action was filed.

Plaintiff has alleged in the Amended Complaint that it first discovered improprieties in December, 1987. It has also submitted sworn testimony to that effect. To the extent this aspect of the defendants' motion is to be treated as a summary judgment motion, at a minimum there appears to exist a genuine issue of material fact to be resolved at trial. While defendants will be free to prove at trial that plaintiff had sufficient notice of the excess charges early in 1987, and delayed unreasonably in pursuing possible claims, defendants' current motion for summary disposition of this issue must be denied.

### III. Applicability of Section 12(2) of the Securities Act

As previously indicated, plaintiff has asserted a claim under Section 12(2) of the Securities Act.[12] That provision states:

> Any person who—
>
>    *    *    *    *    *    *
>
> (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or

**10.** According to Gensicke, Vail came to him in December, 1987 and asked him to prepare a computer printout of certain of the PO Trust and CMO transactions. That printout was sent to an outside broker to check on prices.

**11.** Defendants suggest "storm warnings" may have existed as early as May, 1987. Gensicke testified about conversations during which Ernest Badaracco, the bank's former CEO, warned him about "improprieties from [defendant] First Interregional." Defendants' Reply Brief, p. 18. From an examination of the deposition transcripts, however the improprieties appear to relate to bribes accepted by brokers rather than a practice of overcharging clients. Reference is

also made to the existence of supervisory decrees governing the operations of First Regional. This is hardly a specific "storm warning" concerning the practices alleged in the Amended Complaint.

**12.** Plaintiff's Section 12(2) claims are limited to excessive markups in the sale of CMOs. An express exception exists in Section 12(2) for securities exempted under Section 3(a)(2) of the Securities Act, relating to government issued securities. The PO Trusts, which are issued by government created agencies, are thus exempt from Section 12(2). The CMOs, which are packaged and issued by broker-dealers, are not specifically exempt.

of the mails, *by means of a prospectus or oral communication,* which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security. (emphasis added)

15 U.S.C. § 77*l*.

The CMOs which are the subject of this dispute were not purchased by plaintiff in an initial offering, i.e., just after broker-dealers packaged underlying securities and issued the CMOs for the first time. Instead, the CMOs in question were purchased in the secondary market where they had been trading for a period of time. This is the only relevant fact to defendants' motion to dismiss the Section 12(2) claims. Once again, a purely legal question without controlling Third Circuit or Supreme Court precedent has arisen.

It is defendants' position that section 12(2) applies only to an initial distribution of securities and not to subsequent trading. (Citing *Ralph v. Prudential–Bache Securities,* 692 F.Supp. 1322 (S.D.Fla.1988); *SSH Co., Ltd. v. Shearson Lehman Bros., Inc.,* 678 F.Supp. 1055, 1059 (S.D.N.Y.1987); *Leonard v. Shearson Lehman/American Express Inc.,* 687 F.Supp. 177, 179 (E.D.Pa. 1988) ("[Section 12(2)] is intended to redress prospectus or registration statement fraud in a buyer/seller relationship in an initial transaction")).

Section 12(2) imposes liability on a "person who ... offers or sells a security ... by means of a prospectus or oral communication." According to defendants' interpretation, "prospectus or oral communication" refers to a prospectus, registration statement, or other communication related to a batch offering of securities, not to subsequent trading. Defendants' Brief, pp. 13–14.

Beyond asserting the meaning of the words in the statute—which are less than explicit and the subject of somewhat inconsistent judicial interpretatation—defendants advance only one conceptual argument to support their position. Defendants argue generically that the Securities Act was intended to regulate the initial distribution of securities and that the Exchange Act was intended to regulate post-distribution trading. Defendants' Brief, p. 14, (citing *Ralph, supra,* 692 F.Supp. at 1323).

Although, as a practical matter, there is some validity to defendants' broad distinction between the two primary securities statutes, the conceptual overlap and interrelationships are less clearcut. For one, the Exchange Act was divided into two titles. Title I was denominated "Regulation of Securities Exchanges," and Title II was denominated "Amendments to Securities Act of 1933." On this basis alone, it does not appear accurate to flatly state the Securities Act has nothing to do with issues addressed by the Exchange Act. The comparative purposes of the Securities Act and the Exchange Act were recently described by the Third Circuit in *Data Access:*

The relevant law stems from two landmark statutes: the Securities Act of 1933 and the Securities Exchange Act of 1934. The 1933 Act was described as an Act to "provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof, and *for other purposes.*" The Securities Exchange Act of 1934, 48 Stat. 881, as amended, 15 U.S.C. § 78a *et seq.,* was described as an Act "to provide for the regulation of securities exchanges and of over-the-counter markets operating in interstate and foreign commerce

and through the mails, to prevent inequitable and unfair practices on such exchanges and markets, *and for other purposes."*

843 F.2d at 1547–48 (emphasis added). This recent Third Circuit articulation of the relative purposes of the Securities Act and the Exchange Act does not completely support the hard and fast distinction argued by defendants in this case. To be sure, the Securities Act contains all of the operative provisions governing new securities offerings. The above language, however, suggests that the Securities Act may have a broader concern, i.e., to ensure full and fair disclosure concerning securities sold across state lines.[13] There is no suggestion that the concern about full and fair disclosure is restricted to new offerings of securities across state lines. Instead, the broad language is read to apply to both new offerings and subsequent trades.

■ This issue of whether Section 12(2) of the Securities Act can be applied to fraud occurring in the secondary markets arose recently in another court in this Circuit. In *Ballay v. Legg Mason Wood Walker, Inc.*, No. 88–6867, 1988 WL 137464 (E.D.Pa. Dec. 21, 1988), the issue was resolved as follows:

> Legg Mason also argues that Section 12(2) is only designed to prohibit misrepresentations and omissions which accompany an initial offering of stock. This argument is based on the premise that the Securities Act of 1933 is a narrow statute chiefly concerned with disclosure and fraud in connection with initial public offerings of securities and that Congress waited until the Securities Exchange Act of 1934 to regulate abuses in the trading of securities in the "aftermarket." ... Again, we do not agree. In the first

instance, we note that *there is no language in Section 12(2) itself which would limit its application to fraud in connection with initial distribution of securities.* Moreover, although the Supreme Court has specifically stated that the "1933 Act was primarily concerned with the regulation of new offerings," *United States v. Naftalin,* 441 U.S. 768, 777–778 [99 S.Ct. 2077, 2083–2084, 60 L.Ed.2d 624] (1979), the Naftalin Court also found that the "antifraud prohibition of Section 17(a) [of the 1933 Act] was meant as a major departure from that limitation. Unlike much of the rest of the Act, it was intended to cover any fraudulent scheme in an offer or sale of securities, whether in the court (sic) of an initial distribution or in the course of ordinary market trading." *Id.* Although the Naftalin Court's finding was limited to the antifraud prohibition of Section 17(a) of the 1933 Act, Section 12(2) comprises the other antifraud provision of the 1933 Act. *Wilko v. Swan,* 127 F.Supp. 55, 58 (S.D.N.Y.1955). *Certainly, the Supreme Court's finding that the antifraud prohibition of Section 17(a) "was intended to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the court (sic) of ordinary market trading" should apply to the other antifraud provision of the 1933 Act as well.* After all, it has been noted that Sections 17 and 12(2) serve the dual purpose of "render[ing] unlawful and authoriz[ing] civil recovery for fraud and misrepresentation in the sale of securities ..." *Wilko v. Swan, supra.* (emphasis added).[14]

It has not been compellingly demonstrated why the reasoning in *Ballay* should be

---

**13.** As indicated below, there is at least one other provision of the Securities Act that has been held applicable to a transaction not involving an initial distribution. *See United States v. Naftalin,* 441 U.S. 768, 777–78, 99 S.Ct. 2077, 2083–2084, 60 L.Ed.2d 624 (1979) (discussing Section 17(a) of the Securities Act).

**14.** It is noted that, although perhaps this issue was not squarely briefed and argued in these cases, there are at least three cases in which

plaintiffs were allowed to proceed with their Section 12(2) claims despite the fact that the alleged fraud involved trades in outstanding securites. *See, e.g. Quincy Co-op Bank v. A.G. Edwards and Sons, Inc.,* 655 F.Supp. 78, 81 (D.Mass.1986); *Monetary Management Group v. Kidder Peabody Co.,* 615 F.Supp. 1217, 1219–20 (E.D.Mo.1985); *Roger v. Lehman Brothers Kuhn Loeb, Inc.,* 604 F.Supp. 222, 223–24 (S.D. Ohio 1984).

ignored. The key words at issue in Section 12(2)—"person who offers or sells a security ... by means of a prospectus or oral communication"—are plainly capable of being read to allow application in the secondary market context.[15] When defendants sold CMOs and PO Trust securities to plaintiff, they can be characterized as "person[s] who [sold] a security ... by means of an ... oral communication."

It is basically inclusion of the word "prospectus" in Section 12(2) (which is not included in Section 17(a), the Securities Act provision held applicable in the secondary market context) which defendants argue supplies the basis for reading the statute narrowly. Apart from the fact that the Third Circuit in *Data Access* emphasized the broad remedial purposes of the Securities Act (to "provide full and fair disclosure" in connection with interstate securities sales), defendants' precise and well-refined analysis of certain words in the statute (or the absence of them), although thought provoking, does not compel the conclusion Section 12(2) was meant to apply only in connection with new securities offerings.

If, on the other hand, Section 12(2) referred to a person who "offers a security by means of a prospectus or *related* oral communication," it would be more clear the statute was not intended to apply to after-market transactions. Instead, Section 12(2) refers to the act of a person who "offers or sells"[16] a security by means of a "prospectus or oral communication."[17]

Addressing the same issue but focusing on a different word in the statute, the court in *Wilko v. Swan*, 127 F.Supp. 55 (S.D.N.Y. 1955), rejected a construction of Section 12(2) which would limit the scope of the statute by the status of the "seller":

Under the defendants' proffered construction of Sec. 12(2), whether a "sale" is involved would turn upon the posture of the seller, i.e., as an insurer, underwriter, dealer, or trader employing the facilities of a national securities exchange.

Such a construction would frustrate the remedial purposes of the statute and lead to absurd and wholly incongruous results. The rights of a purchaser of securities publicly offered for sale would depend not upon whether fraud in fact was practiced but upon the status of the vendor. Fraudulent seller would be placed in two categories: one encompassing those engaged in the distribution of securities; the other, those engaged in trading transactions. Purchasers from sellers of the first category would have the protection and the benefits of the Act while purchasers from sellers of the latter category would not. Nothing in the Act reflects a more tender regard for the dishonest trader, nor a purpose to protect only purchasers defrauded by sellers other than traders.

---

**15.** In construing Section 12(2), step one is to look to the plain language of the statute, which, in absence of any ambiguity, should be given its plain meaning. *See Pinter v. Dahl,* —— U.S. ——, 108 S.Ct. 2063, 2075, 100 L.Ed.2d 658 (1988); *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

**16.** The word "offers" conjures up the notion of a "public offering." The additional word "sells," although unclear in its meaning, is more readily understood to involve securities transactions generally, including those other than public offerings. In *Wilko v. Swan,* 127 F.Supp. 55 (S.D.N.Y.1955), referred to below, the court noted that the term "sale" or "sell" as defined in Section 2(3) of the Securities Act, 15 U.S.C. § 77b, includes every contract of sale or disposition of a security.

**17.** Inclusion of the word prospectus appears to refer to new public offerings. The question

here concerns the meaning of the words "or oral communication." If, as indicated above, this reference were more closely linked to the word prospectus (as in "or *related* communication") defendants' argument would be more compelling. If Congress intended to so narrowly limit the application of Section 12(2), more narrow words were available to do so.

An observation might be made that, in the world of selling securities, there exist a limited number of "advertising vehicles." Although the prospectus is the primary selling tool used to create interest in new securities, underwriters and brokers may well bolster the sales pitch with oral representations. Although there may exist a way to reconcile the words of the statute to apply only in the case of initial offerings, however, it appears there are more compelling reasons to construe the words more broadly.

127 F.Supp. at 59. *See also Scotch v. Moseley*, 709 F.Supp. 95 (M.D.Pa.1988) (citing extensive authority for proposition Section 12(2) of Securities Act is not limited to initial distributions); Steinberg, *Section 17(a) of the Securities Act of 1933 After Naftalin and Redington*, 68 Geo.L.J. 163, 180 (1979) ("Nothing in [section 12(2)] specifically limits the prohibition of such 'oral communications' to those occurring only during the initial distribution"). In light of the Third Circuits' broad interpretation of the purposes of Securities Act (articulated in *Data Access*) and the wording of the section, Defendants' motion to dismiss the Section 12(2) claims is denied.[18]

### IV. Plaintiff's Motion to File the Amended Complaint

■ Leave to file amendments of the pleadings under Rule 15(a) is in the discretion of the court and should be granted freely. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77, *reh'g denied*, 401 U.S. 1015, 91 S.Ct. 1247, 28 L.Ed.2d 552 (1971). The most important factor in deciding whether to grant leave to amend is whether the non-moving party will suffer prejudice as a result of the amendment. *Cornell & Co. v. Occupational Safety and Health Review Commission*, 573 F.2d 820 (3d Cir.1978). "[T]he non-moving party must do more than simply claim prejudice; it must show that it will be unfairly disadvantaged or deprived of the opportunity to present facts

or evidence...." *Hill v. Equitable Bank, N.A.*, 109 F.R.D. 109 (D.Del.1985).

■ Plaintiff has moved to file the Amended Complaint which (1) drops certain of the claims defendants seek to have dismissed in their motion, (2) seeks to include claims for relief based on additional legal theories, and (3) seeks to add certain detail, the absence of which defendants claim justifies dismissal of various counts in the Current Complaint.[19]

Plaintiff stresses the defendants will not suffer prejudice by the proposed amendments because none of the amendments changes the nature of the litigation. As indicated in the introduction to this opinion, plaintiff primarily seeks to include in the Amended Complaint claims under RICO (and the New Jersey counterpart). In addition, in what it refers to as a "housekeeping amendment," plaintiff also seeks to add "aiding and abetting" liability under the federal securities laws in Count I (noting that aiding and abetting liability has already been alleged under the common law fraud count, Count VIII).

According to plaintiff, as far as the racketeering claims are concerned, it is not alleging any factual issues which were not already present in the case. It is merely proposing a different theory of recovery based upon the same fraudulent conduct of the defendants. *See Hill v. Equitable Bank, N.A.*, 109 F.R.D. 109 (D.Del.1985) (granting leave to amend securities fraud

---

**18.** Defendants also argue that dismissal of plaintiff's claims under Sections 12(2), 10(b) and Rules 10(b)–5 mandates dismissal of plaintiff's control person liability claims under Section 15 of the Securities Act, 15 U.S.C. § 77*o*, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) because failure to show liability of a controlled person is fatal is a control person liability claim. (Citing *Jenkins v. Fidelity Bank*, 365 F.Supp. 1391, 1402 (E.D.Pa.1973), *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)). Because defendants' motions to dismiss plaintiff's claims under Section 12(2) of the Securities Act and Section 10(b) of the Exchange Act have been denied, however, defendants' further motion to dismiss the claims of controlled person's liability must likewise be denied.

**19.** In addition, plaintiff indicated in the Current Complaint its intention to name as additional defendants the persons working for defendants

who participated in the setting of the excessive mark-ups by identifying such persons as "John Doe" defendants. Plaintiff claims discovery has revealed the identity of Richard Goettlich as a "John Doe" defendant and it now moves to amend to name him as an individual defendant. (Citing *Gillespie v. Civiletti*, 629 F.2d 637 (9th Cir.1980); *Does 1–60 v. Republic Health Corp.*, 669 F.Supp. 1511 (D.Nev.1987); *Swartz v. Gold Dust Casino, Inc.*, 91 F.R.D. 543 (D.Nev.1981)). Plaintiff has set forth in its brief a detailed summary of the discovery which indicates Goettlich's involvement in this matter. Because plaintiff made its intentions to identify John Doe defendants clear and because there has not been opposition (setting forth the existence of unfair prejudice) to include Goettlich as a defendant, plaintiff's motion to amend in this regard is granted.

complaint to add a RICO claim because defendant would not suffer prejudice; it had notice of the facts previously alleged and the factual posture of the case would not be substantively changed).

As to the addition of a claim for aiding and abetting liability under federal law, plaintiff again argues the amendment does not change this case either legally or factually. It argues such liability is already asserted along with the claim of common law fraud. This amendment, it is argued, simply makes the two main fraud counts identical with respect to secondary liability. Defendants were thus on notice they were charged with secondary liability for the unlawful conduct. *See Index Fund, Inc. v. Hagopian*, 609 F.Supp. 499 (D.C.N.Y.1985) (granting leave to amend to add aiding and abetting liability because claims are based on the same set of facts and circumstances as previously outlined under other theories of secondary liability).

Defendants have made several arguments why leave should not be granted to add racketeering and aiding and abetting claims. First, and most importantly, defendants argue amendment would be futile under *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) because, on the alleged facts of this case, plaintiff does not state a viable claim for relief under RICO, or for aiding and abetting federal securities fraud.[20] The *prima facie* validity of the new claims sought to be included in the Amended Complaint is addressed below. Because plaintiff can withstand a Rule 12(b)(6) motion to dismiss the new claims, defendants' primary argument against the filing of the Amended Complaint is rejected.

■ Second, defendants argue the motion to amend should be denied because it has been brought "only months from the date of trial," and the plaintiff "was aware of the all the facts" upon which the RICO claims are based at the inception of this case in August, 1988. Defendants cite *Johnson v. Rogers*, 551 F.Supp. 281 (C.D. Cal.1982) where, after considering a motion to amend a securities fraud complaint eight months after filing an initial complaint to include RICO charges, the court concluded that

"Based on the severity of the remedies available under RICO, the eight month delay [in asserting the RICO claims] and the absence of any justifiable excuse for the delay, the Court exercises its discretion under Rule 15(a) of the Federal Rules of Civil Procedure and denies plaintiffs' motions to add the RICO claims."

*Id.* at 284.

Despite the defendants' characterization of it as an "eleventh-hour attempt at amendment," plaintiff has been responsible in this matter. Several observations are made in this regard. Unlike in *Johnson* (where the plaintiff delayed eight months for no apparent reason), the plaintiff here promptly attempted to proceed with discovery upon the filing of the original complaint on August 16, 1988. Defendants, however, were apparently less than cooperative when it came to plaintiff's discovery requests, a problem noted in the letter-opinion issued in this matter on December 29, 1988.[21]

On the specific issue of plaintiff's delay before bringing its RICO claims, it is noted that plaintiff gave notice of its intent to add the RICO counts in its Memorandum of

---

**20.** Probably the only thing plaintiff and defendants agree about in this matter is that leave to amend may be denied where the amendment fails to state a cause of action and thus would not withstand a motion to dismiss, *Foman*, 371 U.S. at 178, 83 S.Ct. at 227; *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 613 (3d Cir.1987), and that in determining whether a proposed amendment is futile, a court should apply the same standards as are aplied to Rule 12(b)(6) motions to dismiss. *Satellite Financial Planning v. First National Bank*, 646 F.Supp. 118, 120 (D.Del.1986).

**21.** While defendants were producing illegible documents, plaintiff exhibited cooperative tactics by reasonably negotiating the elimination of certain allegations in the complaint which defendants found objectionable. Plaintiffs' reasonableness in this litigation appears again in connection with the present motions. While it is arguable the legal issues were undecided in this Circuit, plaintiff voluntarily dismissed certain counts in the Current Complaint rather than proliferate the scope of the active motion practice in this matter.

Law, served upon defendants on February 9, 1989. Plaintiff's motion to amend was actually served on defendants' counsel on February 17, 1989. During the five months between the original filing in August, 1988 and the providing of notice of intention to amend, plaintiff attempted, with little apparent cooperation, to gain access to the underlying documents in this case. While plaintiff's counsel in this matter was surely aware of the RICO statute, counsel appears to have refrained from filing a standard form complaint asserting blanket RICO claims without the benefit of more complete knowledge of the facts. It further appears plaintiff was investigating whether a "pattern of racketeering activity" existed.[22] It appears plaintiff did not irresponsibly or inexcusably delay in seeking to bring a RICO cause of action.

Finally, defendants argue they will suffer unfair prejudice if plaintiff is allowed to add a RICO claim—which carries with it the possibility of treble damages—at this time. Defendants argue they have already completed their discovery, suggesting that this case is on the eve of trial. The trial is currently scheduled to begin in this matter on September 5, 1989. The facts in this case—which appear to be primarily in the hands of the defendants—should be quite straightforward. Having been aware of possible RICO claims since the beginning of February, 1989, defendants will have had up to seven months (and four months from this date) to review the facts. Should this be insufficient to prepare for trial, consideration of an adjournment may be warranted. Plaintiff's motion to file the Amended Complaint is granted.

## V. Addition of RICO Claims

The court's responsibility at this stage is to examine plaintiffs' purported RICO cause of action and determine whether, assuming the allegations to be true, the underlying wrongs alleged state a claim under RICO.[23] As the Supreme Court has indicated, RICO is to be read broadly "to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985) (quoting Pub.L. 91–452, section 904(a), 84 Stat. 947). Complaints alleging RICO violations are held to a liberal pleading standard. *Rose*, 871 F.2d at 357.

As has been recognized by numerous district courts, the RICO statute is not one which is easily applied. For a substantive violation of RICO, a plaintiff must allege "(1) the conducting of, (2) an enterprise, (3) through a pattern, (4) of racketeering activity." *Marshall–Silver Constr. Co. v. Mendel*, 835 F.2d 63, 65 (3d Cir.1987) (citing *Sedima*, 473 U.S. at 496, 105 S.Ct. at 3285). Each of these elements must be alleged to state a claim under RICO. *Sedima*, 473 U.S. at 495–96, 105 S.Ct. at 3284–85. Although the required elements of enterprise, pattern and racketeering activity have undergone repeated interpretation and refinement since the Supreme Court set the definitional groundwork for the RICO statute in *Sedima*, a coherent methodology for evaluating RICO claims remains elusive. In this case, defendants first argue plaintiff has failed to allege facts in the Amended Complaint which amount to a "pattern" of racketeering activity.

### Pattern

The task of clarifying the criteria necessary to establish a pattern of racketeering has proven cumbersome. The RICO statute offers little guidance. "Racketeering activity" includes state law crimes, such as

---

**22.** In this regard, although the facts will presumably be disputed, discovery appears to have revealed a more significant problem with excessive markups than plaintiff originally anticipated. In December, 1988, in connection with defendants' motion to strike, the plaintiff's briefs suggested the aggregate amount of the excessive markups was around $2 million. According to plaintiff's brief in opposition to defendants' current Rule 12(b)(6) motion, that figure now purportedly approaches $5 million.

**23.** Pursuant to 18 U.S.C. § 1962(c),

"It shall be unlawful for any person employed by or associated with any enterprise engaged in or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

murder, bribery and extortion, and a specified list of federal crimes which includes securities fraud, mail fraud and wire fraud. 18 U.S.C. § 1961(1). A "pattern of racketeering activity" requires at least two acts of racketeering activity within a ten year period. 18 U.S.C. § 1961(5) (1982). In *Sedima*, while the Court did not articulate a brightline test for determining whether a pattern exists, it did provide some guidance in a footnote which reads:

> As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity." § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added).

473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.

The circuit courts have not reached a consensus as to how the pattern requirement, and in particular the "continuity" aspect of it, is to be applied. *Morgan v. Bank of Waukegan*, 804 F.2d 970, 974 (7th Cir.1986) (noting different analysis conducted by the Fifth, Eighth and Eleventh Circuits). Despite the implications of the *Sedima* footnote—that at least two acts of racketeering must be alleged to constitute a RICO violation—the Third Circuit has unequivocally rejected a two act requirement. *Barticheck v. Fidelity Union Bank First Nat. State*, 832 F.2d 36, 38 (3d Cir. 1987). Similarly, although *Sedima* emphasized the concepts of "continuity" and "re-

lationship" in its discussion of the RICO pattern, the Third Circuit has declared that these concepts are not determinative. *Id.* at 39.

While clearly articulating what a pattern does not have to be, the Third Circuit declined to set forth what qualities a RICO pattern must possess. Instead the court seemed to suggest that the concept of "racketeering pattern" defies conclusive definition. *Id.* at 39. Accordingly, the *Barticheck* court chose to adopt a case-by-case analysis of the pattern requirement:

> [T]he existence of a RICO pattern does not turn on the abstract characterization of racketeering acts as 'continuous' and 'related' but rather on a combination of specific factors such as the number of unlawful acts, the length of the time over which the acts were committed, the similarity of the acts, the number of the victims, the number of the perpetrators, and the character of the unlawful activity.

*Id.* 832 F.2d at 38–39. The Seventh Circuit has also adopted a factually based approach to assessing the existence of a pattern. *Morgan*, 804 F.2d at 976 ("The requirement of pattern of racketeering is a standard, not a rule, and as such its determination depends on the facts and circumstances of the particular case, with no one factor being necessarily determinative.")

Because the case law in this area offers only abstract suggestions of what a pattern need not constitute, it is helpful to examine cases where a pattern of racketeering activity has been found to exist. *Barticheck* involved a claim by twenty-three investors in a failed limited partnership. Plaintiffs alleged defendants promoted the limited partnership as a venture involved in oil and gas drilling. It was alleged defendants fraudulently induced plaintiffs to purchase interests in the venture by making several material misrepresentations regarding the financing, price and potential profitability of the scheme. Finding that plaintiffs alleged sufficient facts to constitute a pattern, the court held: "Although the complaint states only that defendants committed 'two or more' acts of

mail fraud in furtherance of their alleged scheme, it may fairly be inferred from the nature of the scheme that defendants engaged in considerably more than two such acts." 832 F.2d at 39. Looking beyond the specific allegations set forth in the complaint, the court inferred that the complexity of the alleged scheme in and of itself suggested a continuous—in the sense of extensive—pattern. *Id.* at 40.

Further developing this "flexible interpretation" of the RICO pattern requirement, the Third Circuit in *Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052 (3d Cir.1988), *pet. for cert. filed*, June 17, 1988, held that even a single episode can constitute a pattern. In that case, a competitor of a company which obtained a military procurement contract from Nigeria brought a RICO action alleging a scheme to influence the award of defense contracts through the bribery of Nigerian officials. The predicate acts alleged in the complaint—mail and wire fraud, bribery and violations of the Foreign Corrupt Practices Act—were all committed in connection with the underlying scheme. Focusing on the complexity of the scheme, the court held that if the appellants' allegations proved to be true, the wire and mail fraud communications used to implement the scheme account for numerous violations of federal law and accordingly adequately allege a RICO violation. *Id.* at 1063–64; *but see Superior Oil Co. v. Fulmer*, 785 F.2d 252, 257 (8th Cir.1986) (where predicate acts are all in furtherance of a single scheme, there is insufficient continuity among the predicate acts and pattern requirement is not met).

It is also instructive to note when the Third Circuit has concluded a RICO pattern was not alleged. In *Marshall–Silver*, a general contractor brought suit under RICO and various state laws for defendant's misconduct in allegedly filing a fraudulent involuntary bankruptcy petition. Examining the facts alleged, the court found "a single victim, a single injury, and a single short-lived scheme with only two active perpetrators." 835 F.2d at 67. Affirming the district court's dismissal of plaintiff's claims, the court concluded:

"This is not criminal activity with the kind of continuity of which we spoke in *Barticheck.*" *Id.*

The Second Circuit recently had occasion to examine this issue in *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir.1989), *pet. for cert. filed*, March 7, 1989. Plaintiffs brought a class action against developers for the fraudulent promotion of a condominium conversion plan. The complaint alleged the fraudulent condominium conversion scheme was commenced in 1984 by means of an offering plan mailed to 8,286 tenants as well as other potential buyers. The offering plan was alleged to have contained a number of material misrepresentations. It was also alleged that there had been several amendments to the offering plan since 1984 which perpetuated the original misrepresentations. The court found:

> There can be no question that the thousands of alleged mail frauds here had the necessary interrelationship to be considered a pattern. All of the mailings were made to groups of persons related by either their tenancy in Parkchester apartments or their potential interest in purchasing such apartments. All of the frauds allegedly had the same goal, i.e., inflating the profits to be made by the defendants in the sale of the Parkchester apartments.

*Id.* at 1392. Refining its analysis of RICO's pattern element, the Second Circuit concluded that a RICO pattern may be established "without proof of multiple schemes, multiple episodes, or multiple transactions; and that acts which are not widely separated in time or space may nonetheless properly be viewed as separate acts of racketeering activity for purposes of establishing a RICO pattern." *Id.* at 1391.

Based upon the foregoing, there appears to exist sufficient allegations of a RICO "pattern" in the Amended Complaint. Defendants essentially argue the Amended Complaint alleges a single fraudulent scheme with a single victim. Even if plaintiff is considered a single victim of the excessive markups at issue in this litiga-

tion,[24] it has been noted both in this opinion and in the Letter–Opinion and Order, dated December 29, 1988, that defendants are the subject (or have been) of other investigations concerning a similar practice of charging excessive markups to other investors. As indicated previously, there has not been a ruling on the relevance, for whatever purpose, of past improprieties or the historic relationship between the defendants and the two regulatory bodies which govern them (the SEC and the NASD). It is merely noted that, in connection with defendants' current effort to summarily dismiss the Amended Complaint, the past difficulties of the defendants cannot be ignored.

As to the facts asserted in this specific case, however, defendants' argument that no RICO pattern exists because plaintiff has merely alleged a single fraudulent scheme must be rejected. The essence of what has been alleged is a pattern of fraudulent overcharges, which have occurred repeatedly over the course of two years. The scope of the alleged "pattern" of fraud in this case is best revealed by referring to the data in footnote 8, which demonstrate this case involves "continuity," not "sporadic activity." *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. Under *Barticheck's* flexible approach to evaluating facts relevant to the existence of a pattern, the multiple instances of fraudulent overcharging, over this period of time, constitute a pattern in this case. *See also United States v. Grayson*, 795 F.2d 278, 290 (3d Cir.1986) (six predicate acts over one and one-half years sufficient for "pattern" under RICO); *Bank of America v. Touche Ross & Co.*, 782 F.2d 966, 971 (11th Cir. 1986) (nine separate acts of mail and wire fraud over three years sufficient for a pattern under RICO).

*Rule 9(b)*

■ A claim under RICO alleging mail, wire or other fraud, must be pleaded with particularity pursuant to Fed.R.Civ.P. 9(b). *Saporito v. Combustion Engineering, Inc.*, 843 F.2d 666, 673 (3d Cir.1988). Rule 9(b) states:

> **Fraud, Mistake, Condition of the Mind.** In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The requirements of Rule 9(b) for a RICO claim are construed liberally in the Third Circuit. *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 100 (3d Cir.1983). Rule 9(b) must be harmonized with the flexibility permitted under Rule 8 of the Federal Rules of Civil Procedure. *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 792 (3d Cir.1984), *cert. denied* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). That Rule requires a "short and plain statement" with each pleading being "simple, concise and direct." *See Simcox v. San Juan Shipyard, Inc.*, 754 F.2d 430, 440 (1st Cir.1985) ("Rule 9 must be read in conjunction with Rule 8 which provides that a complaint should not be struck for the failure to follow a form if the nature of the claim is apparent.")

A complaint need not read like a laundry list of dates, times and persons involved in the underlying transaction. As the Third Circuit explained in *Seville:*

> Rule 9(b) requires plaintiffs to plead with particularity the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent be-

---

**24.** Plaintiff has disagreed with such a characterization of the situation, noting that all the depositors of plaintiff are also victims of the fraud. *Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052 (3d Cir.1988) (identified as victims of the fraudulent scheme not only the corporate plaintiff, but all the citizens of Nigeria); *Town of Kearny v. Hudson Meadows Urban Renewal*, 829 F.2d 1263 (3d Cir.1987)

(victim of corrupt scheme to bribe town officials by real estate developers includes not only rival developer, but all the residents of the town); *Rubin, et al. v. Posner, et al.*, 701 F.Supp. 1041, 1052 (D.Del.1988) ("Although 'formalistically' the single victim is PEC, in reality every shareholder of PEC is a victim of the alleged fraud.")

havior. It is certainly true that allegations of "date, place or time" fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

742 F.2d at 791. As long as the complaint sets forth enough information to provide factual support for plaintiff's allegations, it meets the standard set forth in *Seville*. However, although the requirements of Rule 9(b) are interpreted liberally, each element of a RICO claim must be presented with detail sufficient to put the defendant on notice of the claims against him. This requirement of particularity also serves "to demonstrate plaintiffs have investigated the alleged fraud and reasonably believe a wrong has occurred." *Kronfeld v. First Jersey Nat. Bank*, 638 F.Supp. 1454, 1465 (D.N.J.1986); *see also* Fed.R.Civ.P. 11.

■ The Amended Complaint provides adequate specificity as to the allegations of fraud in this case. The allegations are quite straightforward: without disclosing it to plaintiff, the defendants charged excessive markups on a number of CMO and PO Trust security transactions. While the above cases might not have required it, plaintiff, after obtaining further discovery, is able to allege in the Amended Complaint exact details as to the dates of individual transactions and the amount of the excess overcharges. Under the liberal requirements of notice pleading, such an outline is sufficient. "It is the function of discovery to fill in the details and of trial to establish fully each element of the cause of action." *Seville*, 742 F.2d at 790.

*"Person" and "Enterprise" Requirement*

■ An "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact though not a legal entity." 18 U.S.C. § 1961(4) (1982). An enterprise must exist separate and apart from the RICO defendant. *See Rose*, 871 F.2d at 358; *Town of Kearny v. Hudson Meadows*

*Urban Renewal Corp.*, 829 F.2d 1263, 1266 (3d Cir.1987); *Bennett v. United States Trust Co. v. New York*, 770 F.2d 308, 315 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). This distinction between the enterprise and the person conducting the affairs of the enterprise focuses the court's attention on the culpable party and "recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity." *Bennett*, 770 F.2d at 315. Although the Third Circuit has not set forth any uniform interpretation of the statutory definition of enterprise, it has considered various qualities which an enterprise may possess. In *Town of Kearny*, defendants' association was deemed an enterprise in view of its structure for decisionmaking, its role in overseeing and coordinating the commission of several predicate offenses and other activities carried out on an ongoing basis. 829 F.2d at 1266.

As explained by defendants, a defendant in a civil RICO claim must be a "person" as that term is defined in § 1961(3): "[P]erson includes any individual or entity capable of holding a legal or beneficial interest in property ..." Pursuant to § 1962(c), such "person" must be "employed by or associated with" an enterprise, which is defined as

"[A]ny individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Under the language of Section 1962(c), the "person" subject to liability must be a separate and distinct entity from the "enterprise." *B.F. Hirsch v. Enright Refining Co., Inc.*, 751 F.2d 628, 633 (3d Cir.1984).

One of the defendants in this case, First Interregional Equity Corporation ("FIEC"), wholly owns another of the defendants, First Interregional Government Securities, Inc. ("FIGS"). Defendants argue in this case that defendant FIEC cannot be deemed to be "associated with" FIGS be-

cause FIGS is FIEC's "wholly-owned" subsidiary. Defendants also contend: "For purposes of Section 1962(c), [FIEC] is 'the same entity' as FIGS, and not 'employed by' or 'associated with' FIGS. Plaintiff's motion to amend to include its racketeering claim against [FIEC] must thus be denied for failure to allege a RICO 'enterprise' separate and distinct from the RICO 'persons.'" Defendants' Brief in Opposition to Plaintiff's Motion to Amend, p. 19.

Once again, a purely legal question has arisen where there is a split of authority in the circuits, and an absence of Third Circuit and Supreme Court precedent directly on point. On this issue of whether a parent corporation and its wholly-owned subsidary can be "associated" with each other for RICO purposes, defendants have cited cases involving both "subsidiaries" and "operating divisions." *See NCNB National Bank of North Carolina v. Tiller*, 814 F.2d 931, 936 (4th Cir.1987) ("As appellants concede, this court has previously held that a 'person' is not distinct from an 'enterprise' when a corporation and its wholly owned subsidiary are involved"); *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir.1982) (A corporation, in common parlance, is not regarded as distinct from its unincorporated divisions); *Satellite Financial Planning v. First Nat. Bank*, 633 F.Supp. 386, 405 n. 23 (D.Del.1986) ("The complaint alleges a RICO 'enterprise' consisting entirely of wholly-owned or nearly-wholly-owned subsidiaries. Such related entities can conspire in violation of RICO no more than they could for antitrust purposes under *Copperweld*").

■ For the reasons that follow, however, it is concluded that a parent corporation can be a "person" separate and distinct from its wholly-owned subsidiary, the "enterprise." First, as indicated above, a "person" is defined under RICO as "any individual or entity capable of holding a legal or beneficial interest in property."

§ 1961(3). A separately incorporated entity is clearly capable of holding a legal or beneficial interest in property.[25] Under the plain terms of the statute, it would appear FIEC is a person, and is thus capable of associating with FIGS.

Second, the cases which have indicated parent companies and their wholly-owned subsidiaries lack the necessary separateness for RICO purposes have apparently relied upon the Supreme Court decision in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). *Copperweld* held that a parent corporation and its wholly-owned subsidiary are not capable of conspiring with one another for purposes of section one of the Sherman Act, because that Act is premised on the "basic distinction between concerted and independent action."

Corporations and their individual operating divisions were historically deemed one entity for purposes of evaluating the possible existence of an antitrust conspiracy between two persons. Intending to eliminate antitrust motivations to organize business units as divisions rather than subsidiaries, the court in *Copperweld* rejected the long standing notion of the "bathtub conspiracy" whereby a parent corporation and its wholly-owned subsidiary were considered two separate parties capable of conspiring. As pointed out in the cases which discuss the applicability of *Copperweld* in the RICO context, the more reasoned conclusion is that parents can be considered "persons" capable of associating with their subsidiaries under RICO.

In *Haroco v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384 (7th Cir.1984), *aff'd on other grounds*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), the Seventh Circuit held "the subsection [1962(c)] requires only some separate and distinct existence for the person and the enterprise, and a subsidiary corporation is certainly a legal entity distinct from its

---

**25.** A different conclusion might have to be drawn about the ability of an "operating division" of a corporation to hold property in its own name; property held by the division of a corporation would presumably be held in the

legal interest of the corporation. For this reason, it is perhaps more apparent that companies and their divisions are held to lack the necessary separateness for RICO purposes.

parent." 747 F.2d at 402. *Haroco* distinguished RICO from the Sherman Act on the grounds that RICO is not premised on the distinction between concerted and independent action. 747 F.2d at 403 n. 22. Corporate affiliates can be said to be "associated" despite the fact that, for Sherman Act purposes, they are not held liable for conspiring.

In *Philadelphia TMC, Inc. v. AT & T Information Systems,* 651 F.Supp. 169 (E.D.Pa.1986), the court stated that:

> ... the separation required by Section 1962(c) does not require that the two separate entities be fully independent in the same sense that Section 1 of the Sherman Act does. The RICO 'enterprise' could well be a passive instrumentality through which the RICO 'person' engages in a pattern of racketeering activity. The fact that a wholly owned subsidiary is compliant to the will of its parent corporation in no way precludes the parent from associating with the subsidiary, or from conducting the subsidiary's affairs through a pattern of racketeering activity.

*Id.* at 173.

The resolution of this issue—which involves fairly technical reasoning and which has been approached differently by various courts to date—turns on whether the rationale in *Copperweld* is automatically applied. While some courts have automatically applied *Copperweld* without discussion in this RICO context because, nominally, the issue involves the separateness between parent companies and their subsidiaries (which has some superficial appeal), other courts have more carefully considered the words in the RICO statute and the relative policies underlying the Sherman Act and RICO. Although it has been held parent companies and wholly-owned subsidiaries will not be held liable for conspiring to violate the antitrust laws, the words of the RICO statute appear to be aimed at restricting certain activities of such entities. Defendants' argument that the RICO claim fails as a matter of law because the "person" and the "enterprise" are affiliated corporations is rejected.

*Racketeering Activity*

Defendants argue that in order to adequately plead "racketeering activity" for a RICO claim, a plaintiff must not only allege that the defendants committed the predicate offenses set forth in § 1961(1), but, for those predicate acts alleging fraud, such offenses must be pleaded with particularity under Fed.R.Civ.P. 9(b). *Saporito v. Combustion Engineering Inc.,* 843 F.2d 666, 673 (3d Cir.1988).

They go on to argue at length that plaintiff has failed to allege, with adequate particularity, predicate acts of mail fraud and wire fraud. This argument turns out to be a red herring because the existence of wire fraud and mail fraud is not necessary in this case. The primary claims contained in the Current Complaint involve claims for securities fraud. The adequacy of the pleadings, as far as particularity are concerned, was previously discussed. Securities fraud is specifically listed as a predicate act of racketeering activity under § 1962.

It appears the defendants have ambitiously attacked the adequacy of the mail fraud and wire fraud allegations because they sought to have the securities fraud claims dismissed. It has been concluded, however, that plaintiff's securities fraud claims survive defendants' motion to dismiss. At the hearing on defendants' motion, moreover, defense counsel conceded that the existence of securities fraud suffices as a predicate act under RICO.

If the securities fraud claims could not have been prosecuted because they were time-barred, it would have been necessary to address the issue of whether the alleged wrongful acts, although no longer giving rise to an actionable securities fraud claim, would be eligible to constitute "predicate acts" under RICO, with its own statute of limitations period. Because the securities fraud claims (particularly the allegations of the underlying activities) remain in the Amended Complaint, however, it is not necessary to engage in a detailed evaluation of the mail fraud and wire fraud claims at this time.

**760**

## VI. Aiding and Abetting

 Finally, defendants have attacked the viability of the federal aiding and abetting claims. In this Circuit, a party may be held liable as an aider and abettor to a fraud where: (1) there has been a commission of a wrongful act—an underlying securities violation; (2) the alleged aider and abettor had knowledge of the act; and (3) the aider and abettor knowingly and substantially participated in the wrongdoing. *Monsen v. Consol. Dressed Beef Co., Inc.,* 579 F.2d 793, 799 (3d Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978).

 "[T]he 'substantial assistance' element of aider and abettor liability may be satisfied by 'inaction ... where the plaintiff demonstrates that the aider-abettor consciously intended to assist in the perpetration of a wrongful act,'" *Kronfeld, supra,* 638 F.Supp. at 1470. To the extent this is a case involving inaction, the question presented is whether plaintiff has asserted facts in the Amended Complaint from which a reasonable inference could be drawn that the individual defendants had "thrown in" with each other to assist in the commission of securities fraud. *See Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 497 (7th Cir.1986); *Segal v. Coburn Corp. of America,* [1973] CCH Fed.Sec.L.Rep. 94,002 at p. 94,021, 1973 WL 389, (E.D.N.Y.1973).

 Paragraph 36 of the Amended Complaint alleges, in relevant part,

> ... and the defendants also aided and abetted such violations by knowingly rendering substantial assistance to each other as set forth above.

While defendants attack the allegation as lacking any specificity as to how the substantial assistance requirement is met, the allegation is quite plain and, under Rule 12(b)(6), to be construed liberally.

### Conclusion

For the reasons set forth above, defendants' motion is denied in all respects and plaintiff's motion to file the Amended Complaint is granted.

SO ORDERED.